No. 23-16094

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JASON WOLFORD; ALISON WOLFORD; ATOM KASPRZYCKI; HAWAII FIREARMS COALITION,

*Plaintiffs-Appellees*,

v.

ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Hawai'i
No. 1:23-cv-00265-LEK-WRP, Hon. Leslie E. Kobayashi

---

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING APPEAL AND FOR AN IMMEDIATE ADMINISTRATIVE STAY PENDING DISPOSITION OF THE STAY MOTION

## <u>IMMEDIATE RELIEF REQUESTED</u>

---

ANNE E. LOPEZ
   *Attorney General of the State of Hawai'i*
KALIKO'ONĀLANI D. FERNANDES
   *Solicitor General*
NICHOLAS M. MCLEAN
   *First Deputy Solicitor General*
STATE OF HAWAI'I
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

NEAL KUMAR KATYAL
DANA A. RAPHAEL
   *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

MARY B. MCCORD
RUPA BHATTACHARYYA
   *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

BEN GIFFORD
   *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

*Attorneys for Defendant Anne E. Lopez, in her official capacity as
Attorney General of the State of Hawaiʻi*

## CIRCUIT RULE 27-3 CERTIFICATE

Defendant-Appellant Anne E. Lopez, in her official capacity as Attorney General of the State of Hawai'i, moves this Court on an emergency basis for an order staying the district court's appealable temporary restraining order pending an appeal and for an immediate administrative stay pending the Court's consideration of Appellant's stay request. *See* Fed. R. App. P. 8(a)(2) & 27(a); 9th Cir. R. 27-1 & 27-3.

The undersigned counsel certifies that the following is the information required by Circuit Rule 27-3:

1. **Names, telephone numbers, e-mail addresses, and office addresses for the parties**

*Counsel for Defendant-Appellant Anne E. Lopez, in her official capacity as Attorney General of the State of Hawai'i:*

Kaliko'onālani D. Fernandes, *Solicitor General*
Nicholas M. McLean, *First Deputy Solicitor General*
State of Hawai'i Department of the Attorney General
425 Queen Street, Honolulu, Hawai'i 96813
Telephone: (808) 586-1360
Email: kaliko.d.fernandes@hawaii.gov
Email: nicholas.mclean@hawaii.gov

Neal Kumar Katyal, *Special Deputy Attorney General*
Dana A. Raphael, *Special Deputy Attorney General*
Hogan Lovells US LLP
555 Thirteenth Street N.W., Washington, D.C. 20004
Telephone: (202) 637-5600
Email: neal.katyal@hoganlovells.com
Email: dana.raphael@hoganlovells.com

Mary B. McCord, *Special Deputy Attorney General*
Rupa Bhattacharyya, *Special Deputy Attorney General*
Institute for Constitutional Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue N.W., Washington, D.C. 20001
Telephone: (202) 661-6607
Email: mbm7@georgetown.edu
Email: rb1796@georgetown.edu

Ben Gifford, *Special Deputy Attorney General*
Institute for Constitutional Advocacy & Protection
Georgetown University Law Center
PO Box 211178, Brooklyn, NY 11221
Telephone: (202) 662-9835
Email: bg720@georgetown.edu

**Counsel for Plaintiffs-Appellees Jason Wolford; Alison Wolford; Atom Kasprzycki; and Hawaii Firearms Coalition:**

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605, Honolulu, Hawaiʻi 96813
Telephone: (808) 521-3367
Email: kevin@kevinogradylaw.com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive, San Diego, California 92123
Telephone: (619) 905-9105
Email: alan.alexander.beck@gmail.com

## 2. Facts showing the existence and nature of the emergency

The district court enjoined five provisions of a crucial public safety law

enacted by the Hawaiʻi Legislature ("Act 52"), which prohibits carrying firearms

in certain sensitive locations and on private property without consent. Dkt. 66.

Although the district court characterized its ruling as a temporary restraining order,

ii

the 91-page decision is, in substance, a preliminary injunction: "[t]he parties vigorously contested the legal basis for the TRO in written briefs and oral arguments," *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017) (per curiam), "[t]he district court's order has no expiration date, and no hearing has been scheduled," *id.*, and "emergency relief is necessary to support [the State's] interests," *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763 (9th Cir. 2018).

The district court glossed over threshold issues of standing to apply an extraordinary test for firearm restrictions that goes far beyond the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The district court concluded that *Bruen* prohibits the legislature from designating *bars*, *restaurants serving alcohol*, *banks*, *parks*, and *beaches* as "sensitive places"—despite a robust tradition of analogous firearms restrictions. In applying its sensitive-places analysis, the court heavily relied on the approach taken in two outlier district court decisions that have both been stayed in relevant part pending appeal. *See Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), *stayed pending appeal*, No. 22-2908 (2d Cir. Dec. 7, 2022), *application to vacate stay denied*, No. 22A557 (U.S. Jan. 11, 2023); *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023), *stayed pending appeal*, No. 23-1900 (3d Cir. June 20, 2023). The district court

also held that *Bruen* prevents the State from honoring private property rights by establishing that individuals cannot carry firearms onto others' property without permission. And the court enjoined a provision of Act 52 based on the notion that it prohibits carrying firearms in parking lots that are shared between sensitive and non-sensitive locations—even though the State *disclaimed* Plaintiffs' incorrect interpretation of the provision to cover such parking lots.

An emergency stay pending appeal is warranted and necessary. The order prevents the State from enforcing duly-enacted statutory provisions that protect sensitive locations from gun violence. The order also allows individuals to carry firearms into businesses without seeking the owners' consent. The order creates confusion on the ground, and is highly disruptive to the work of law enforcement agencies across the State—which have invested significant time and energy into implementing Act 52 and now must rework those efforts on the fly. Like the Second Circuit in *Antonyuk* (which stayed the district court's injunction as to the sensitive-places provisions and the private property rule challenged there) and the Third Circuit in *Koons* (which stayed the district court's injunction as to almost all of the challenged sensitive-places provisions), this Court should stay the district court's order pending appeal.

### 3. Timing of the motion

Following the issuance of the district court's temporary restraining order on

iv

August 8 (Dkt. 66), Appellant filed a motion in the district court on August 11 to stay the order pending appeal or, in the alternative, enter an administrative stay to permit application to this Court for a stay pending appeal (Dkts. 67, 67-1). The district court has not granted Appellant's motion for a stay pending appeal, and Appellant's stay motion remains pending before the district court. Appellant filed a notice of appeal from the August 8 order enjoining enforcement of the relevant provisions of Act 52 on August 14. Dkt. 68. Because the district court has not granted (or otherwise acted on) the stay motion, Appellant seeks emergency relief from this Court. Under the circumstances, this Motion could not reasonably have been filed earlier.

### 4. When and how counsel notified

Counsel for Appellees were notified by email on August 15 regarding this motion. Counsel for Appellees have stated that they oppose this motion.

### 5. Submissions to the district court

Pursuant to Fed. R. App. P. 8(a)(2)(A)(ii), Appellant states that, a motion to stay having been made in the district court on August 11, 2023 (Dkt. 67), the district court has not afforded the relief requested. A motion to stay remains pending in the district court. In the alternative, Appellant also requested entry of an administrative stay pending the submission of a motion to this Court. As of the date and time of this Motion, the district court has not granted an administrative

stay. Should the district court grant or deny a stay pending appeal, Appellant shall immediately notify this Court.

<div style="display:flex; justify-content:space-between;">
<div>

Dated: August 15, 2023

ANNE E. LOPEZ
    *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
    *Solicitor General*
NICHOLAS M. MCLEAN
    *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

MARY B. MCCORD
RUPA BHATTACHARYYA
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

</div>
<div>

Respectfully submitted,

/s/ Neal Kumar Katyal

NEAL KUMAR KATYAL
DANA A. RAPHAEL
    *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

</div>
</div>

*Attorneys for Defendant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawaiʻi*

# TABLE OF CONTENTS

Page

CIRCUIT RULE 27-3 CERTIFICATE ...................................................................i

TABLE OF AUTHORITIES ................................................................ viii

INTRODUCTION ..........................................................................1

BACKGROUND ............................................................................5

LEGAL STANDARD........................................................................8

ARGUMENT ..............................................................................9

I.    The State Is Likely To Succeed On The Merits ........................................9

      A.    The District Court's Order Is Appealable ........................................9

      B.    Plaintiffs Lack Standing To Challenge Several Provisions ....................................................................10

      C.    Act 52's Sensitive-Place Provisions Are Constitutional.................12

      D.    The Private Property Default Rule Is Constitutional ......................18

II.    The Balance of Harms Favors A Stay ......................................................19

III.    A Stay Is In The Public Interest ...............................................................20

IV.    Any Injunctive Relief Should Be Narrowed Pending Appeal .................20

CONCLUSION ..........................................................................20

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**C**ASES:

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ......................................................................... 9

*Antonyuk v. Hochul,*
   No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ....................... 4

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...................................................................... 13, 14

*Duncan v. Becerra,*
   No. 17-cv-1017-BEN-JLB, 2019 WL 1510340 (S.D. Cal. Apr. 4, 2019) ........... 20

*E. Bay Sanctuary Covenant v. Barr,*
   934 F.3d 1026 (9th Cir. 2019) ....................................................... 2, 20

*E. Bay Sanctuary Covenant v. Trump,*
   932 F.3d 742 (9th Cir. 2018) ............................................................ 9

*Frey v. Nigrelli,*
   No. 21-cv-05334 (NSR), 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023) ............ 11

*GeorgiaCarry.Org, Inc. v. Georgia,*
   687 F.3d 1244 (11th Cir. 2012) .................................................... 14, 18

*Koons v. Platkin,*
   No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) ............. 4

*LA All. for Hum. Rts. v. County of Los Angeles,*
   14 F.4th 947 (9th Cir. 2021) ........................................................... 10

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010) .......................................................... 10

*Maryland Shall Issue, Inc. v. Montgomery Cnty.,*
   No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) .................... 19

*Maryland v. King,*
   567 U.S. 1301 (2012) ..................................................................... 19

*New York State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ........................ 2, 3, 5, 12, 13, 14, 15, 17, 18

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................ 1

# TABLE OF AUTHORITIES—CONTINUED

<u>Page</u>

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) ..................................................... 11, 12

*Simon v. Eastern Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976) ............................................................................. 10

*United States v. Class*,
  930 F.3d 460 (D.C. Cir. 2019) ........................................................... 17

*United States v. Tallion*,
  No. 8:22-po-01758-AAQ, 2022 WL 17619254 (D. Md. Dec. 13, 2022)............ 12

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017)............................................................... 9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................. 1

**STATUTES:**

HRS § 134-A ......................................................................................... 11

HRS § 134-A(a)(1).................................................................... 5, 6, 8, 10

HRS § 134-A(a)(4)........................................................... 5, 6, 7, 12, 13, 15, 16

HRS § 134-A(a)(9).............................................................. 5, 6, 7, 13, 16, 17

HRS § 134-A(a)(12)........................................................... 5, 6, 7, 10, 13, 15

HRS § 134-E .............................................................. 6, 7, 10, 11, 18, 19

**RULE:**

Fed. R. Civ. P. 65(b) ............................................................................. 9

Defendant Anne E. Lopez, in her official capacity as Attorney General of the State of Hawai'i ("Appellant," "Attorney General," or "the State"), moves for a stay pending appeal of the district court's August 8, 2023 "Order Granting in Part and Denying in Part Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction." Dkt. 66.[1] Although characterized as a TRO, the order plainly meets the requirements for an immediate appeal. The State also moves for an administrative stay pending this Court's consideration of the stay motion.

## INTRODUCTION

The district court issued a sweeping, statewide TRO prohibiting enforcement of numerous provisions of a crucial Hawai'i public safety law ("Act 52"), even though none of the *Winter* factors supported a TRO and all of the *Nken* factors favored a stay.[2] The order rests on fundamentally incorrect legal and historical premises, and is disruptive to the work of law enforcement agencies across the State, which have invested significant time and energy into implementing Act 52 and now must rework those efforts on the fly. The order should be stayed in full pending appeal, and an immediate administrative stay should be entered pending the Court's consideration of this motion.

---

[1]    All record citations are to the District Court docket, No. 1:23-cv-00265-LEK-WRP (D. Haw.).

[2]    *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Nken v. Holder*, 556 U.S. 418 (2009).

Although the district court's order purported to apply the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), it in fact applied a standard wholly untethered from that set out by the Supreme Court. For example:

1. The district court enjoined the Act's restrictions on carrying guns in *bars*, even though Plaintiffs "specifically limited" their challenge to the restriction on *restaurants* and did not even challenge the restrictions on bars, *see* Dkt. 1 (Complaint) ¶¶ 45(B), 47(B), 49(B), 51(B), 57—and even though the State came forward with a wealth of historical evidence supporting restrictions on all establishments that serve alcohol. The district court's order plainly cannot be squared with this Court's "well-established rule that injunctive relief must be tailored to remedy the specific harm alleged." *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (cleaned up).

2. The district court enjoined the State's restriction on carrying guns in *parks*, despite ample historical support, based on a flawed analysis that is far more restrictive than anything required by *Bruen*. The court discounted important legal authorities banning firearms in parks in New York and Pennsylvania because, according to the court, those States covered "only about 4% of this Nation['s]" population in 1860. Dkt. 66 at 62 & n.17. But the very source cited by the district court makes clear that New York and Pennsylvania accounted for nearly *22%* of

2

the Nation's population, not 4%. Not only that, but the district court's approach—transforming a passing remark in *Bruen* into an arbitrary, bright-line population requirement for any and all historical traditions—has no basis in the law.

**3.** The district court disregarded a host of authorities from the 1870s, 1880s, and 1890s. The order suggests that laws post-dating the Fourteenth Amendment's ratification should be discounted, but *Bruen* never adopted such an extreme rule. Instead, *Bruen* cautioned against relying on "*inconsistent*" post-ratification evidence. 142 S. Ct. at 2137 (emphasis in original). Moreover, it does not appear that the historical analogues cited by the State were challenged or struck down on constitutional grounds during the nineteenth century, *see, e.g.*, Dkt. 55-2 (Cornell Decl.) ¶¶ 48, 57, 62, and there is nothing to suggest that any contemporaneous courts saw such sensitive-place provisions as unconstitutional. *Cf. Bruen*, 142 S. Ct. at 2133 (stating that the Supreme Court was "aware of no disputes regarding the lawfulness of . . . prohibitions" on "18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

**4.** As for parking lots shared by sensitive and non-sensitive locations, the district court enjoined an application of the Act that *the State itself had disclaimed as reflecting an incorrect reading of the statute*. Where the Attorney General has disclaimed plaintiffs' incorrect reading of the law, the district court should not adopt that incorrect reading in order to reach a constitutional issue and enjoin the

law.  That is the opposite of constitutional avoidance, and it violates bedrock Article III principles.  Plaintiffs have no standing to challenge a law that, correctly interpreted, does not even cover their proposed conduct.

**5.**  In its sensitive-places analysis, the district court heavily relied on two outlier district court decisions—*Antonyuk v. Hochul*, No. 1:22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022), and *Koons v. Platkin*, No. 22-7464 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023)—but these decisions have been stayed in relevant part pending appeal.  *See* No. 22-2908 (2d Cir. Dec. 7, 2022), *application to vacate stay denied*, No. 22A557 (U.S. Jan. 11, 2023); No. 23-1900 (3d Cir. June 20, 2023).[3]  Like the Second Circuit in *Antonyuk* and the Third Circuit in *Koons*, this Court should stay the district court's order pending appeal.

**6.**  The district court enjoined the Act's restriction on carrying guns in *banks*, even though Plaintiffs identified no banks where they would be allowed to carry if the Act were enjoined, and even though the State identified centuries of examples of prohibitions in sensitive commercial centers.  The court likewise enjoined the Act's restriction on carrying guns on private property without authorization, even though Plaintiffs' alleged injuries are caused entirely by the choices of property owners, and even though the State identified a number of historical analogues.

---

[3]    Both Circuits stayed the district court orders as to sensitive places; the Second Circuit also stayed the order as to the private property default rule.

## BACKGROUND

The Hawai'i Legislature enacted Act 52 to address the dangers of firearms and gun violence. This important public safety measure designates certain locations as sensitive places where guns may not be carried, and it prohibits individuals from carrying firearms on private property without permission. In passing Act 52, the Legislature sought to promote public safety "while respecting and protecting the lawful exercise of individual rights." Dkt. 55-34 (McLean Ex. 1) at 2-3. The State carefully followed the Supreme Court's recent guidance in *Bruen*, which recognized a right to public carry of firearms, but emphasized that "the Second Amendment is not 'a regulatory straightjacket.' " *Id.* at 2 (quoting *Bruen*, 142 S. Ct. at 2133). The State sought in particular to "protect areas in which carrying or possessing dangerous weapons has traditionally been restricted, such as schools and other places frequented by children, government buildings, polling places, and other analogous locations." *Id.* at 3; *see also Bruen*, 142 S. Ct. at 2133 ("assum[ing] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment").

As relevant here, Act 52 prohibits firearms in government buildings, *see* HRS § 134-A(a)(1); bars and restaurants serving alcohol, *see id.* § 134-A(a)(4); parks and beaches, *see id.* § 134-A(a)(9); banks and financial institutions, *see id.* § 134-A(a)(12); and adjacent parking areas to all the foregoing. The Act also

5

prohibits carrying firearms on the private property of another person without express authorization. *See id.* § 134-E. These provisions took effect July 1, 2023.

On June 23, Plaintiffs sued the Attorney General and sought a TRO and PI. Dkts. 1, 7. Plaintiffs challenged HRS § 134-A(a)(4), as applied to restaurants (but not bars) serving alcohol and adjacent parking areas; HRS § 134-A(a)(9), as applied to parks, beaches, and adjacent parking areas; HRS § 134-A(a)(12) in its entirety; and HRS § 134-A(a)(1), as applied to parking areas adjacent to government buildings that were also covered by § 134-A(a)(4), (9), or (12). Plaintiffs also challenged HRS § 134-E, the private property default rule.

The State filed its opposition on July 14, providing four reasons why Plaintiffs were not entitled to relief. *See* Dkt. 55. *First*, Plaintiffs failed to establish standing with respect to §§ 134-A(a)(4), (12), and 134-E, because they did not identify any restaurants or banks that would allow them to carry firearms in the absence of the challenged provisions, and because any purported injury from the inability to carry on non-sensitive private property was caused by property owners' decisions to withhold consent, among other reasons. *Second*, Plaintiffs did not meet their burden with respect to any of the challenged provisions of showing that the Second Amendment's plain text covered their specific conduct. *Third*, even if the plain text did cover Plaintiffs' conduct, a long tradition of firearms regulation supported each of the challenged provisions. With respect to

6

§ 134-A(a)(4), the State identified a host of laws from the 1700s and 1800s that regulated the interaction of firearms and alcohol, including laws prohibiting the possession of firearms in places that sold alcohol. With respect to § 134-A(a)(9), the State identified a tradition of prohibiting firearms in parks going back to the beginning of the modern American parks movement in the mid-1800s. *See, e.g.*, Cornell Decl. ¶ 57. With respect to § 134-A(a)(12), the State highlighted an unbroken history of regulation from the 1300s to the 1800s banning firearms in sensitive commercial centers. And with respect to § 134-E, the State submitted numerous laws from the Founding and Reconstruction eras requiring permission (and sometimes written permission) to carry firearms on private property. *Fourth*, the remaining injunction factors weighed heavily against Plaintiffs.

The district court held a hearing on July 28 and issued a 91-page order on August 8 that enjoined each of the challenged provisions. Although the district court's order purported to grant Plaintiffs' motion only "in part," Dkt. 66, the court awarded Plaintiffs all the relief they sought. The district court enjoined § 134-E as to any private property "held open to the public," and it enjoined the portions of § 134-A(a)(9) prohibiting the carrying of firearms in parks, beaches, and their adjacent parking areas. Dkt. 66 at 91. The court also enjoined § 134-A(a)(12) and § 134-A(a)(4) in their entirety, *see id.*, despite the fact that Plaintiffs sought an injunction of the latter provision only as to restaurants, *see* Dkt. 7 at 2. And the

7

court enjoined § 134-A(a)(1) with respect to parking areas that did not exclusively serve government buildings, *see* Dkt. 66 at 91, despite the fact that the State explained at the hearing that these areas were not covered by § 134-A(a)(1), *see* Tr. 17-18 (July 28, 2023) (Add. 92-131).

Beginning with standing, the district court misapplied basic principles of traceability and redressability, and it uncritically accepted declarations that Plaintiffs submitted for the first time with their Reply.  *See* Dkt. 66 at 25-31.  On the merits, the court incorrectly held that the Second Amendment's plain text presumptively protects the right to carry firearms on private property open to the public, *see id.* at 41-46, and it dismissed the wealth of historical precedents that the State offered for each of the challenged sensitive places.  Even where the State's analogues should be properly characterized as "historical twins," the court supplied artificial reasons to discount them, including reasons that Plaintiffs never raised, and some that appear to rely on basic errors.

## LEGAL STANDARD

Courts consider four factors when deciding whether to grant a stay of an appealable TRO: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) (per curiam) (citation omitted).  Each factor is satisfied here.

## ARGUMENT

### I. <u>The State Is Likely To Succeed On The Merits.</u>

#### A.     The District Court's Order Is Appealable.

A TRO is appealable where, as here, "it possesses the qualities of a preliminary injunction," meaning that it was "strongly challenged in adversarial proceedings before the district court" and "will remain in force for longer than the fourteen-day period identified in [Fed. R. Civ. P.] 65(b)."  *Washington*, 847 F.3d at 1158 (cleaned up).  Here, "[t]he parties vigorously contested the legal basis for the TRO in written briefs and oral arguments," *id.*; *see* Dkts. 7-1, 55, 61, 62, and "[t]he district court's order has no expiration date, and no hearing has been scheduled," *Washington*, 847 F.3d at 1158; *see* Dkt. 66 at 90-91.  And where, as here, "the Government argues in this court that emergency relief is necessary to support [its] interests," it is appropriate to "treat the district court's order as an appealable preliminary injunction."  *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 763 (9th Cir. 2018) (citing *Washington*, 847 F.3d at 1158); *see Abbott v. Perez*, 138 S. Ct. 2305, 2319 (2018) ("[T]he label attached to an order is not dispositive," and "where an order has the practical effect of granting . . . an injunction, it should be treated as such for purposes of appellate jurisdiction." (cleaned up)).

**B.    Plaintiffs Lack Standing To Challenge Several Provisions.**

Plaintiffs failed to "make a clear showing of each element of standing" for "each form of relief sought." *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956-957 (9th Cir. 2021) (citations omitted).  Plaintiffs lack standing to challenge HRS § 134-A(a)(1) because, as the district court acknowledged, the State made clear that "the parking areas adjacent to government buildings which are listed in the Complaint are not considered areas protected by § 134-A(a)(1)."  Dkt. 66 at 35.  Plaintiffs have therefore not shown "an intention to engage in a course of conduct . . . proscribed by a statute," nor a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citations omitted).  For other challenged provisions, Plaintiffs failed to show that their alleged injuries "fairly can be traced to the challenged action of the defendant," as opposed to "the independent action of some third party not before the court."  *Simon v. Eastern Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976).  Plaintiffs did not allege or offer evidence that any financial institution would allow them to carry firearms absent the prohibition in HRS § 134-A(a)(12), meaning that any purported injury is caused not by the State, but by financial institutions' decisions to exclude firearms.  *See* Dkt. 7-1 at 16 ("Plaintiffs here do not challenge that right of a private property owner.").

Likewise, with respect to HRS § 134-E, any injury Plaintiffs claim to suffer

from not being able to carry firearms on others' property without consent is caused by owners' decisions to withhold that consent. Act 52 changes nothing about the rights of individuals to control their property: other than those places designated as sensitive in HRS § 134-A, business owners who wish to allow firearms on their property may do so. For similar reasons, an injunction against the enforcement of HRS § 134-E cannot redress Plaintiffs' claimed injuries. Moreover, because Plaintiffs "fail[ed] to provide any statement . . . indicating that [they would] not seek permission before carrying [on] private property"—and did not even allege that having to seek consent would be burdensome—they "fail[ed] to establish injury-in-fact." *Frey v. Nigrelli*, No. 21-cv-05334 (NSR), 2023 WL 2473375, at *9 (S.D.N.Y. Mar. 13, 2023). And because each of the business owners from whom Plaintiffs submitted declarations with their reply brief stated that, "[i]f H.R.S. § 134-E were repealed or enjoined or otherwise no longer in effect, I would allow members of the public who have concealed carry permits, *including the Plaintiffs in this case*, to carry in my business and on my property," *e.g.*, Dkt. 61-3 at 3 (emphasis added), Plaintiffs have now received "express authorization to carry a firearm on the property by the owner," HRS § 134-E.

The district court erred in concluding that Plaintiffs had standing. The court relied on *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), in which this Court held that censorship of a Twitter user's speech was fairly traceable to the actions of

a government official who had flagged the speech for Twitter's removal. *Id.* at 1161-62. But *O'Handley* is clearly distinguishable. The plaintiff there alleged that Twitter had taken his posts down at the request of the government official. *Id.* at 1154. Here, by contrast, Plaintiffs do not allege that banks or owners of non-sensitive private property have chosen to prohibit them from carrying guns because of any request by the State.

### C. Act 52's Sensitive-Place Provisions Are Constitutional.

Even if Plaintiffs had standing, they would not succeed on the merits of their Second Amendment challenge to HRS § 134-A(a)(4), (9), and (12). *Bruen* requires plaintiffs challenging firearms regulations to show that "the Second Amendment's plain text covers [their] conduct." 142 S. Ct. at 2126. If plaintiffs meet that burden, then the government must prove that the challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Plaintiffs failed to show that the plain text of the Second Amendment covers their specific intended conduct. *See* Dkt. 55 at 3 & n.5. Plaintiffs were required to meet their burden as to the course of conduct in which they wish to engage—here, carrying firearms into each challenged location. *See, e.g.*, *United States v. Tallion*, No. 8:22-po-01758-AAQ, 2022 WL 17619254, at *5 (D. Md. Dec. 13, 2022).

Even if Plaintiffs had met that burden, the State showed that the challenged regulations are consistent with the Nation's tradition of firearms regulation.

12

Regarding § 134-A(a)(4), the State identified several Reconstruction-era laws that prohibited firearms in places that served alcohol, *see* Dkt. 55-52 (1853 New Mexico law); Dkt. 55-53 (1879 New Orleans ordinance); Dkt. 55-50 (1890 Oklahoma law), as well as over a dozen other laws from the 1700s and 1800s that regulated the interaction of alcohol and firearms, *see* Dkt. 55 at 8-10. For § 134-A(a)(9), the State showed that the first modern American parks prohibited firearms at their inception in the mid-1800s. *See id.* at 14-16. And for § 134-A(a)(12), the State highlighted a tradition going back to the 1328 Statute of Northampton of prohibiting firearms in sensitive commercial centers. *See id.* at 17-18. In addition, the State submitted declarations from experts in the history of firearms regulation, *see* Cornell Decl.; Dkt. 55-4 (Rivas Decl.), and the American parks movement, *see*, Dkt. 55-30 (Young Decl.), to provide context for these laws.

The State also explained that the challenged provisions are analogous to the sensitive-place laws—including those prohibiting firearms in "schools and government buildings," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and "legislative assemblies, polling places, and courthouses," *Bruen*, 142 S. Ct. at 2133—that the Supreme Court has endorsed. Children congregate at Hawaiʻi's parks and beaches, just as they do at schools. *See* Dkt. 55-33 (Thielen Decl.) ¶ 6. And public parks and beaches are owned by the government, such that they implicate similar concerns as several of the sensitive places listed in *Heller* and

13

*Bruen* regarding the government's ability to regulate as a proprietor. The State also explained that the unique modern status of Hawaiʻi's public beaches "implicat[es] unprecedented societal concerns," which, according to *Bruen*, require "a more nuanced approach" to the historical inquiry. 142 S. Ct. at 2132.

The district court committed numerous errors in holding that Plaintiffs were likely to succeed on their challenge to Act 52's sensitive-place provisions. At the outset, the court mistakenly concluded that the text of the Second Amendment covered Plaintiffs' proposed conduct. *See* Dkt. 66 at 41-46. *Bruen* recognized a right to carry firearms in *public*, *see* 142 S. Ct. at 2156, but the district court expanded that right to *private property* open to the public, *see* Dkt. 66 at 41. This was unwarranted. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012) ("[T]he Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land."), *abrogated in part on other grounds*, *Bruen*, 142 S. Ct. 2111. It also ignored the Supreme Court's admonition that sensitive-place restrictions are "presumptively lawful" such that they fall outside the scope of the Second Amendment. *Heller*, 554 U.S. at 626-627 & n.26.

The court also misapplied *Bruen*'s historical inquiry in several respects. *First*, despite acknowledging that the government need only "identify a well-established and representative *analogue*" of the regulation at issue, "not a historical

14

*twin*," Dkt. 66 at 22 (quoting *Bruen*, 142 S. Ct. at 2133), the court essentially required the State to find a "dead ringer," *Bruen*, 142 S. Ct. at 2133, for each of the challenged provisions. Take, for instance, HRS § 134-A(a)(4), for which the court deemed irrelevant 1700s-era laws that prohibited selling alcohol not just *to* militia members, but also *near* militia members. Dkt. 66 at 46-47. Likewise, with respect to HRS § 134-A(a)(12), the court discounted centuries of prohibitions on firearms in commercial centers. *Id.* at 72-73. The court reasoned that banks are not like commercial centers because they are not as congested as some of those centers, *see id.*, but congestion is not the only relevant point of comparison. As Professor Saul Cornell explained in his declaration supporting the State's opposition, "bans on arms in fairs and markets singled out these locations because they were sites of commerce, entertainment, and politics," and "it was the very fact that individuals congregated in large numbers *and moved about freely, engaging in productive economic, cultural, and political activities* that was the reason arms were prohibited from these locations." Cornell Decl. ¶ 42 (emphasis added). Furthermore, because banks were understood at the Founding to be government instrumentalities, *see* Dkt. 67-1 at 11 n.8, government buildings—which *Heller* and *Bruen* recognized as sensitive—also provide a relevant analogue.

*Second*, the district court artificially constrained the universe of analogues on which the State was permitted to rely in a manner that made it impossible for

15

the State to satisfy its burden under *Bruen*. As to HRS § 134-A(a)(4), for example, the court disregarded the New Mexico, New Orleans, and Oklahoma laws cited above—even though those regulations can appropriately be described as "historical twin[s]," Dkt. 66 at 22—because the court understood *Bruen* "to dismiss any law enacted unless it was done in a state where a significant percentage of the people . . . resided at the time that the Fourteenth Amendment was enacted." *Id.* at 51. Likewise, in its discussion of HRS § 134-A(a)(9), the court dismissed ordinances banning firearms in the Nation's first modern parks because those States covered "only about 4% of this Nation," and because some ordinances were passed "from 1872 through 1886," which the court deemed too late to shed light on the meaning of the Fourteenth Amendment. *Id.* at 61-62. *But see id.* at 66 n.20 (treating an 1870 enactment as " 'during' the Fourteenth Amendment's ratification for the sake of argument"). According to the very population estimates the district court cited from its extra-record source, however, *see id.* at 62 n.17 (stating that the U.S. population in 1860 was 31,443,321, with 3,880,735 people residing in New York and 2,906,215 in Pennsylvania), New York and Pennsylvania had nearly *22%* of the Nation's population, not 4%. And even putting the math aside, the district court erred by (1) relying on population totals at all, and (2) restricting the universe of permissible analogues to pre-1868 (or perhaps pre-1870) state laws. It is true that *Bruen* discounted territorial laws that "contradict[ed] the overwhelming

16

weight of other, more contemporaneous historical evidence," and *Bruen* noted, rhetorically, that the territorial laws at issue "governed less than 1% of the American population," 142 S. Ct. at 2155 (cleaned up). But the Court did not thereby instruct judges to reject historical traditions that happen to fall short of some arbitrary population threshold. And here, unlike in *Bruen*, there is *no* contemporaneous historical evidence that contradicts the laws the State has proffered. Nor is there any evidence suggesting that these laws were considered unconstitutional (or even particularly controversial) in the nineteenth century. *See, e.g.*, Rivas Decl. ¶ 29; Cornell Decl. ¶¶ 22-61.

*Finally*, the district court erred in its understanding of the role that analogy plays in the *Bruen* analysis. In discussing HRS § 134-A(a)(9), for example, the court acknowledged several policy concerns that the State had identified, but it reasoned that "these considerations by themselves do not matter under the *Bruen* analysis." Dkt. 66 at 56. This is incorrect. As the district court acknowledged elsewhere in its order, "[p]olicy concerns might be relevant insofar as they help the government identify a well-established and representative historical analogue to the regulation at issue." *Id.* at 69 (cleaned up). Relatedly, the court mistakenly held that the government's role as proprietor "in a post-*Bruen* world makes no difference." *Id.* at 55. As the D.C. Circuit recognized in *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019), the relevant part of which was not abrogated by

17

*Bruen*, "the government—like private property owners—has the power to regulate conduct on its property," *id.* at 464.  Finally, the court ignored altogether *Bruen*'s admonition that "cases implicating unprecedented societal concerns . . . may require a more nuanced approach."  142 S. Ct. at 2132.

**D.     The Private Property Default Rule Is Constitutional.**

Plaintiffs are also unlikely to succeed on their Second Amendment challenge to HRS § 134-E.  The text of the Second Amendment does not protect the right to carry firearms on private property without consent.  *See GeorgiaCarry.Org*, 687 F.3d at 1264 ("[T]here is no constitutional infirmity when a private property owner exercises his, her, or its . . . right to control who may enter, and whether that invited guest can be armed, and the State vindicates that right.").  Indeed, the district court acknowledged that "where a business revokes a licensee or invitee's permission to enter the business's property, . . . [t]he licensee or invitee's conduct would not be covered by the Second Amendment's plain text."  Dkt. 66 at 45.  Because HRS § 134-E simply prohibits individuals from carrying on private property without consent, it does not burden conduct covered by the Second Amendment's text.  But even if it did, the State put forth more than enough historical precedent to justify HRS § 134-E.  This included numerous laws from the Founding and Reconstruction eras that required permission (and sometimes written permission) to carry on private property.  *See* Dkt. 55 at 21.  The district

court rejected all but one of these analogues on the ground that they "concerned private property like residential lands, which were not generally held open to the public," but cited no historical evidence for that conclusion, *see* Dkt. 66 at 79, and Plaintiffs never argued for it, *see* Dkt. 67-1 at 16. In any event, the court erred again by requiring the State to identify a "historical twin," as laws requiring permission to carry on private property are clearly analogous to HRS § 134-E.

## II. <u>The Balance of Harms Favors A Stay.</u>

The State "suffers . . . irreparable injury" whenever it is barred "from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). The Legislature passed a law protecting sensitive places where people are particularly susceptible to the risks of gun violence. And the Legislature honored private property rights by establishing that individuals cannot carry firearms onto private property without consent. The district court's order prevents the democratic branches from exercising their judgment regarding how best to keep residents safe while respecting their rights. The harm is especially significant given the "law enforcement and public safety interests" implicated by firearms and gun violence. *Id.* Plaintiffs would not be irreparably harmed by a stay pending appeal. *See, e.g.*, *Maryland Shall Issue, Inc. v. Montgomery Cnty.*, No. CV TDC-21-1736, 2023 WL 4373260, at *16 (D. Md. July 6, 2023) ("the likelihood of irreparable harm . . . is

dependent on the likelihood of success on the merits").

## III.   <u>A Stay Is In The Public Interest.</u>

The public interest favors staying the district court's order.  "There is an immeasurable societal benefit of maintaining the immediate status quo while the process of judicial review takes place."  *Duncan v. Becerra*, No. 17-cv-1017-BEN-JLB, 2019 WL 1510340, at *2 (S.D. Cal. Apr. 4, 2019).  The status quo in this case would permit the State to continue enforcing the challenged provisions, which protect public safety and were in effect for over a month prior to the district court's order.  The court erred in discounting the State's interest, particularly based on data submitted for the first time in an amicus brief.  Dkt. 66 at 86-89.

## IV.   <u>Any Injunctive Relief Should Be Narrowed Pending Appeal.</u>

The district court's order should be stayed in its entirety.  At a minimum, it should be stayed in part so that it remains in force only as to Plaintiffs, and only on an as-applied basis.  It is a "well-established rule that injunctive relief must be tailored to remedy the specific harm alleged."  *E. Bay Sanctuary Covenant*, 934 F.3d at 1029.  And as the State argued in the district court, Plaintiffs have failed to show that they are entitled to facial relief.  *See* Dkt. 55 at 23; Dkt. 67-1 at 8-9, 18.

## CONCLUSION

The State respectfully requests that this Court stay the district court's order pending appeal.  The State also requests an immediate administrative stay of the order while the Court considers this motion.

Dated:  August 15, 2023

ANNE E. LOPEZ
    *Attorney General of the State of Hawaiʻi*
KALIKOʻONĀLANI D. FERNANDES
    *Solicitor General*
NICHOLAS M. MCLEAN
    *First Deputy Solicitor General*
STATE OF HAWAIʻI
DEPARTMENT OF THE ATTORNEY GENERAL
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

MARY B. MCCORD
RUPA BHATTACHARYYA
    *Special Deputy Attorneys General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, D.C. 20001
(202) 661-6607
mbm7@georgetown.edu

Respectfully submitted,

/s/ Neal Kumar Katyal
NEAL KUMAR KATYAL
DANA A. RAPHAEL
    *Special Deputy Attorneys General*
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

BEN GIFFORD
    *Special Deputy Attorney General*
INSTITUTE FOR CONSTITUTIONAL
    ADVOCACY & PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 662-9835
bg720@georgetown.edu

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(g), and Circuit Rule 27-1(d), I certify that this motion complies with applicable type-volume and length limitations because this motion is no more than 20 pages, excluding the items exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f).

This motion complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word for Office 365 in 14-point Times New Roman font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

# ADDENDUM

## TABLE OF CONTENTS

Page

Order Granting in Part and Denying in Part Plaintiffs' Motion for
Temporary Restraining Order and Preliminary Injunction
(Dkt. 66)...................................................................................Add. 1

Transcript, Hearing on Plaintiffs' Motion for Temporary Restraining
Order and Preliminary Injunction (July 28, 2023) ...............................Add. 92

UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| JASON WOLFORD, ALISON WOLFORD, ATOM KASPRZYCKI, HAWAII FIREARMS COALITION,<br><br>           Plaintiffs,<br><br>    vs.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII;<br><br>          Defendant. | CV 23-00265 LEK-WRP |

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

An alarming increase in violent crimes involving firearms in Hawai`i has heightened public concerns about guns and safety.[1]  State officials recently responded by enacting a law prohibiting the carrying or possessing of firearms in certain defined locations and premises, such as banks, beaches, and bars.  See generally Act 52 (June 2, 2023) (to be codified at Haw. Rev. Stat. Chapter 134) ("Act 52" and "the Act"). Whether a firearm regulation is consistent with the constitutional protection of the Second Amendment to carry

---

[1] See, e.g., Kirstin Downey, An Increase in 'Violent, Brazen' Crime Raises Concerns on Oahu, HONOLULU CIVIL BEAT (Aug. 30, 2022), https://www.civilbeat.org/2022/08/an-increase-in-violent-brazen-crime-raises-concerns-on-oahu/ (last visited Aug. 8, 2023).

handguns publicly for self-defense has been recently articulated in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022).  It is this powerful collision between Hawai`i officials' concern for the safety and welfare of its citizens and "the Second and Fourteenth Amendments['] [protections of] an individual's right to carry a handgun for self-defense outside the home" that is before this Court today.  See Bruen, 142 S. Ct. at 2122

In their present motion, Plaintiffs Jason Wolford ("J. Wolford"), Alison Wolford ("A. Wolford"), Atom Kasprzycki ("Kasprzycki"), and Hawaii Firearms Coalition ("HRC" and collectively "Plaintiffs") seek to enjoin the State of Hawai`i from enforcing certain provisions of the Act that prohibit carrying handguns in particular areas.[2]  These areas are: parking areas adjacent to buildings or offices owned, leased, or used by the State or a county; restaurants or bars serving alcohol, and their adjacent parking areas; beaches and parks, and their adjacent parking areas; and banks or financial institutions, and their adjacent parking areas.  In addition, Plaintiffs seek to

---

[2] On June 23, 2023, Plaintiffs filed their Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion").  [Dkt. no. 7.]  Plaintiffs filed their reply on July 21, 2023.  [Dkt. no. 61.]  The instant Order addresses only Plaintiffs' request for a temporary restraining order ("TRO").  Plaintiffs' request for a preliminary injunction will be subsequently and separately briefed, heard, and ruled on.

2

**Add. 2**

enjoin enforcement of the Act's provision that prohibits carrying handguns on the private property of another person (for instance, a home, community association, or condominium) unless the property owner or manager gives unambiguous written or verbal authorization, or posts a sign on the property expressing authorization.  Hawai`i, acting through its attorney general, opposes the TRO Motion.[3]

        Plaintiffs' TRO Motion is hereby granted in part and denied in part for the reasons set forth below, insofar as the following challenged provisions (or portions thereof) are enjoined:

-the portions of Haw. Rev. Stat. § 134-A(a)(1) that prohibit carrying firearms in parking areas owned, leased, or used by the State or a county which share the parking area with non-governmental entities, are not reserved for State or county employees, or do not exclusively serve the State or county building;

-the entirety of Haw. Rev. Stat. §§ 134-A(a)(4) and (a)(12);

-the portions of Haw. Rev. Stat. § 134-A(a)(9) prohibiting the carrying of firearms in beaches, parks, and their adjacent parking areas; and

_____

        [3] On July 14, 2023, Defendant Anne E. Lopez, in her official capacity as the Attorney General of the State of Hawai`i ("the State"), filed its Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining (ECF No. 7) ("Memorandum in Opposition.").  [Dkt. no. 55.]  Because Plaintiffs sue Defendant Anne E. Lopez in her official capacity as the State of Hawai`i Attorney General, [Complaint at ¶ 5,] their claims are against the State, see Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State." (citation omitted)).  This matter came on for hearing on July 28, 2023.

**Add. 3**

-the portion of Haw. Rev. Stat. § 134-E that prohibits carrying
    firearms on private properties held open to the public.

The TRO Motion is denied in all other respects.

### BACKGROUND

Plaintiffs filed their Verified Complaint for
Declaratory and Injunctive Relief ("Complaint") on June 23,
2023. [Dkt. no. 1.] Plaintiffs' Complaint and TRO Motion
challenge five State of Hawai`i laws on the grounds that the
laws violate either the First Amendment, Second Amendment,
and/or Fourteenth Amendment of the United States Constitution.
Specifically, Plaintiffs challenge the following Hawai`i laws:
(1) Haw. Rev. Stat. § 134-A(a)(1); (2) Haw. Rev. Stat. § 134-
A(a)(4); (3) Haw. Rev. Stat. § 134-A(a)(9); (4) Haw. Rev. Stat.
§ 134-A(a)(12); and (5) Haw. Rev. Stat. § 134-E. See Complaint
at ¶¶ 57-58; TRO Motion, Mem. in Supp. at 3. Plaintiffs,
however, take care to state that they

> do not challenge the prohibitions in all areas
> under [the Act], instead, [they] challenge only a
> limited subset that impose particularly egregious
> restrictions on their Second Amendment right to
> bear arms.

[Complaint at ¶ 42.]

On June 2, 2023, Hawai`i Governor Josh Green, M.D.,
signed into law Hawai`i Senate Bill No. 1230 - A Bill for an Act
Relating to Firearms. The Act was passed "to clarify, revise,
and update Hawaii's firearms laws to mitigate the serious

4

**Add. 4**

hazards to public health, safety, and welfare associated with firearms and gun violence, while respecting and protecting the lawful exercise of individual rights."  Act 52, § 1 at pgs. 1–2. Amongst other things, and relevant here, the Act "defines locations and premises within the State where carrying or possessing a firearm is prohibited . . . ."  Id. at pg. 2.  The Act further provides: "In prohibiting carrying or possessing firearms in certain locations and premises within the State, this Act is intended to protect areas in which carrying or possessing dangerous weapons has traditionally been restricted, such as schools and other places frequented by children, government buildings, polling places, and other analogous locations."  Id.

Chapter 134 of the Hawai`i Revised Statutes relates to Hawaii's regulations and laws for firearms, ammunition, and dangerous weapons.  Part I concerns the general regulations provided in Haw. Rev. Stat. Chapter 134.  Under Chapter 134 part 1, the chief of police of a county within the State may grant licenses to carry a pistol or revolver – either concealed or unconcealed – if an applicant meets certain requirements. See generally Haw. Rev. Stat. § 134-9.  Section 2 of the Act amended part I of Chapter 134 to include the following language, in pertinent part:

**§ 134-A   Carrying or possessing a firearm in certain locations and premises prohibited; penalty.** (a)  A person with a license issued under section 134-9, or authorized to carry a firearm in accordance with title 18 United States Code section 926B or 926C, shall not intentionally, knowingly, or recklessly carry or possess a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in any of the following locations and premises within the State:

> (1)   Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government;

. . . .

> (4)   Any bar or restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas;

. . . .

> (9)   Any beach, playground, park, or adjacent parking area, including any state park, state monument, county park, tennis court, golf course, swimming pool, or other recreation area or facility under control, maintenance, and management of the State or a county, but not including an authorized target range or shooting complex;

> . . . .

6

        (12) The premises of any bank or financial
             institutions as defined in
             section 211D-1, including adjacent
             parking areas;

       . . . .

 . . . .

       (f)  Any person who violates this section
shall be guilty of a misdemeanor.

Act 52, § 2 at pgs. 3–6, 10 (emphases in original and some

emphases and quotation marks omitted).  Section 2 of the Act

further provides:

      **§ 134-E  Carrying or possessing a firearm
on private property of another person without
authorization; penalty.**  (a)  A person carrying a
firearm pursuant to a license issued under
section 134-9 shall not intentionally, knowingly,
or recklessly enter or remain on private property
of another person while carrying a loaded or
unloaded firearm, whether the firearm is operable
or not, and whether the firearm is concealed or
unconcealed, unless the person has been given
express authorization to carry a firearm on the
property by the owner, lessee, operator, or
manager of the property.

      (b)  For purposes of this section, express
authorization to carry or possess a firearm on
private property shall be signified by:

        (1)  Unambiguous written or verbal
             authorization; or

        (2)  The posting of clear and conspicuous
             signage at the entrance of the building
             or on the premises,

    by the owner, lessee, operator, or manager of the
property, or agent thereof, indicating that
carrying or possessing a firearm is authorized.

7

**Add. 7**

(c)   For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person" means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided that nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d)   This section shall not apply to a person in an exempt category identified in section 134-ll(a).

(e)   Any person who violates this section shall be guilty of a misdemeanor.

Id. § 2 at pgs. 14-16 (emphases in original and some emphases and quotation marks omitted).[4]  In short, § 134-A(a) lists

---

[4] Although these statutes have not yet been numerated in the Hawai`i Revised Statutes, for simplicity this Court will cite to the nomenclature used in Act 52.

**Add. 8**

"sensitive places" where individuals with a license to carry firearms are prohibited from carrying their firearms. Section 134-E creates a default rule that individuals with a license to carry firearms cannot carry their firearms on private property unless the owner of that property gives them consent. These pertinent provisions became effective on July 1, 2023. See id. § 18 at pg. 76.

J. Wolford, A. Wolford, and Kasprzycki ("the Individual Plaintiffs") are individuals living in the County of Maui. See Complaint at ¶¶ 1-3. They allege that each was granted, and now possess, a permit to carry a firearm pursuant to § 134-9. See id. at ¶¶ 59(E) (as to J. Wolford), 60(E) (as to A. Wolford), 61(E) (as to Kasprzycki). HFC is an organization incorporated under Hawai`i law with its principal place of business in Honolulu, Hawai`i. It has thirty-three members with valid concealed carry permits. HFC brings this suit on behalf of its members with a concealed carry permit issued by any county in Hawai`i. [Id. at ¶ 4.] The Individual Plaintiffs are members of HFC. [Id. at ¶ 51.] The Individual Plaintiffs allege they are impacted by the challenged regulations because they each attend and frequent beaches, parks, and their adjacent parking areas, bars and restaurants serving alcohol and their adjacent parking areas, banks and their adjacent parking areas, and parking areas adjacent to

9

**Add. 9**

government buildings, all within the County of Maui.  See
generally id. at ¶¶ 59-61.  As such, Plaintiffs contend §§ 134-
A(a)(1), (4), (9), and (12) are unconstitutional restrictions on
their ability to carry their firearms in these respective
places, in violation of the Second and Fourteenth Amendment.

Further, Kasprzycki owns and operates his own business
along with the associated business property/space.  His business
is open to the public.  See id. at ¶¶ 62-63, 66b.[5]  Kasprzycki
states that some of his clients do not support the concealed
carrying of firearms.  Kasprzycki does not wish to involve his
business in any issues related to the Second Amendment.  [Id. at
¶¶ 64-65.]  He alleges that, "[o]nce H.R.S. § 134-E goes into
effect, [he] will not put up a sign or otherwise give prior
written or verbal consent to carry a firearm.  But for H.R.S.
§ 134-E Kasprzycki would allow people to carry firearms in his
business."  [Id. at ¶ 65.]  Accordingly, Kasprzycki and HFC
contend § 134-E compels speech in violation of the First
Amendment.

Plaintiffs bring this action against the State for
injunctive and declaratory relief under 42 U.S.C. § 1983,

___

[5] Plaintiffs' Complaint has two consecutive paragraphs
numbered 66.  For clarity, the Court refers to the first
paragraph 66 as "paragraph 66a" and the second paragraph 66 as
"paragraph 66b."

10

**Add. 10**

alleging the State violated, and continues to violate, their First, Second, and Fourteenth Amendment rights by restricting certain conduct of individuals with a license to carry firearms. They bring facial and as-applied challenges to §§ 134-A(a)(1), (a)(4), (a)(9), (a)(12), and 134-E.  In the TRO Motion, Plaintiffs seek a TRO to enjoin the challenged laws.  See TRO Motion at 2.

## STANDARD

"[T]he legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" Washington v. Trump, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (quoting Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

> A party moving for preliminary injunctive relief must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) that the balance of harm tips in the movant's favor, and (4) that the injunction is in the public interest.  See All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  "The first factor—likelihood of success on the merits—is the most important factor."  California by & through Becerra v. Azar, 950 F.3d 1067, 1083 (9th Cir. 2020) (en banc) (citation and quotation marks omitted). Additionally, when a party seeks a preliminary injunction against the government, as is the case here, the balance of the equities and public interest factors merge.  See Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing Nken v. Holder, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009)).

Chamber of Com. of the U.S. v. Bonta, 62 F.4th 473, 481 (9th Cir. 2023).

<div align="center">**DISCUSSION**</div>

I.  **The Second Amendment and the United States Supreme Court**

    A.  **Prior to the Twenty-First Century**

Ratified in 1791, the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  To this Court's knowledge, the Supreme Court's first mention of the people's right to bear arms was in the infamous case Dred Scott v. Sandford, 60 U.S. 393 (1857).  There, the Supreme Court held that, because Dred Scott was black, he was not a United States citizen and, as such, he was not entitled to any of the rights guaranteed to United States citizens under the United States Constitution.  See id. at 404-05.  The Supreme Court reasoned, in part, that slaveholder states could not have regarded black people as citizens because then

> it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, and **to keep and carry arms wherever they went**.  And all of this would be done in the face of the subject race of the same color, both free and slaves, and inevitably producing discontent and insubordination among them, and endangering the peace and safety of the State.

<div align="center">12</div>

<div align="center">**Add. 12**</div>

Id. at 417 (emphasis added). A possible implication of the Supreme Court's statement is that United States citizens could "keep and carry arms wherever they went." See id. To that end, this Court notes two vital points: (1) to the extent that the Supreme Court intended to make any holding regarding the right to bear arms in Dred Scott, its statement was purely dictum;[6] and (2) Dred Scott is no longer good law because it was superseded by the Thirteenth and Fourteenth Amendments.

In United State v. Cruikshank, the Supreme Court held that the Second Amendment contains the right "of bearing arms for a lawful purpose. This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." 92 U.S. 542, 553 (1875) (internal quotation marks omitted). The Supreme Court further held that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the national government . . . ." Id. In other words, the Second Amendment does not create a right; rather, it protects a preexisting right from federal overreach.

---

[6] "A statement is dictum when it is made during the course of delivering a judicial opinion, but . . . is unnecessary to the decision in the case and is therefore not precedential." Cetacean Cmty. v. Bush, 386 F.3d 1169, 1173 (9th Cir. 2004) (alteration in Cetacean Cmty.) (brackets, citation, and internal quotation marks omitted).

In <u>Presser v. Illinois</u>, the Supreme Court reaffirmed the holding in <u>Cruikshank</u> and held that a military code which prohibited "bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, d[id] not infringe the right of the people to keep and bear arms." 116 U.S. 252, 264-65 (1886). The Supreme Court further concluded that states could not "prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government." <u>Id.</u> at 265. In dictum, the Supreme Court in <u>Robertson v. Baldwin</u>, mentioned that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons . . . ." 165 U.S. 275, 281-82 (1897).

Forty-two years later, the Supreme Court in <u>United States v. Miller</u>, stated that: "With obvious purpose to assure the continuation and render possible the effectiveness of [Militias (as set forth in Article I, Section 8 of the United States Constitution),] the declaration and guarantee of the Second Amendment were made." 307 U.S. 174, 178 (1939). Thus, the Supreme Court concluded that the Second Amendment "must be interpreted and applied with that end in view." <u>Id.</u> Under that interpretation, the Supreme Court held that the Second Amendment

14

**Add. 14**

did not guarantee the right to keep and bear "a shotgun having a barrel of less than eighteen inches in length" because there was insufficient evidence to show that such a firearm had "some reasonable relationship to the preservation or efficiency of a well regulated militia." Id. (internal quotation marks and citation omitted). The Supreme Court did not decide another Second Amendment case until almost seventy years later.

### B. In the Twenty-First Century

In 2008, the Supreme Court in District of Columbia v. Heller, held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). The Supreme Court came to its conclusion by analyzing the text of the amendment. After its textual analysis, it reviewed some historical background to determine whether that historical background comported with its conclusion; it held that it did. See, e.g., id. at 592-95.

The Supreme Court emphasized, however, that "the right secured by the Second Amendment is not unlimited." Id. at 626. It cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." Id.

**Add. 15**

Although the Supreme Court conducted some historical analysis of the people's right to bear arms, the majority did not provide any reasoning or analysis as to why those enumerated prohibitions pass "constitutional muster," see id. at 629; indeed, it presumed them to be constitutional restrictions, see id. at 627 n.26 ("We identify these **presumptively** lawful regulatory measures only as examples; our list does not purport to be exhaustive." (emphasis added)). The Supreme Court in the end held that a Washington, D.C. ban on firearms in the home violated the Second Amendment. See id. at 628-29. Following on the heels of Heller, in 2010, the Supreme Court in McDonald v. City of Chicago, held that the Second Amendment rights recognized in Heller were incorporated against the states through the Fourteenth Amendment. See 561 U.S. 742, 791 (2010).[7]

After Heller and McDonald, many courts implemented a two-step test to review challenges to regulations that invoked protections secured by the Second Amendment. The two-step test required courts to: (1) determine if the challenged law affected protected conduct under the Second Amendment; and, if so, then (2) apply the appropriate level of scrutiny, based upon the extent to which the challenged law implicates the Second

---

[7] Justice Scalia's concurring opinion begins on page 791, but, for clarity, this cite is to the majority opinion ending on that page.

16

**Add. 16**

Amendment right.  See, e.g., Young v. Hawaii, 992 F.3d 765, 783-
84 (9th Cir. 2021) (en banc), *vacated and remanded*, 142 S. Ct.
2895 (2022).

In 2022, the Supreme Court issued its decision in New
York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111
(2022).  There, the Supreme Court relied on Heller and McDonald
and held that the two-step test – sometimes called "means-end
scrutiny" – utilized by lower courts was wrong and declined to
adopt it.  See Bruen, 142 S. Ct. at 2125-26.  Instead, it held

> that when the Second Amendment's plain text
> covers an individual's conduct, the Constitution
> presumptively protects that conduct.  To justify
> its regulation, the government may not simply
> posit that the regulation promotes an important
> interest.  Rather, the government must
> demonstrate that the regulation is consistent
> with this Nation's historical tradition of
> firearm regulation.  Only if a firearm regulation
> is consistent with this Nation's historical
> tradition may a court conclude that the
> individual's conduct falls outside the Second
> Amendment's "unqualified command."  Konigsberg v.
> State Bar of Cal., 366 U.S. 36, 50, n.10, 81 S.
> Ct. 997, 6 L. Ed. 2d 105 (1961).

Id. at 2126.

After establishing this constitutional standard for
reviewing challenges under the Second Amendment, the Supreme
Court applied it to a challenge to a New York regulation.  That
regulation required applicants who sought a license to conceal
carry a firearm outside of the home to prove that they had a
"proper cause" to be issued such a license.  See id. at 2123.

17

**Add. 17**

The Supreme Court determined that the plain text of the Second Amendment covered the conduct that the challenged law regulated because the Second Amendment "presumptively guarantees . . . a right to bear arms in public for self-defense."  Id. at 2135 (internal quotation marks omitted).  Because "the Second Amendment guarantees a general right to public carry," the Supreme Court stated the government had "the burden . . . to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."  Id. at 2135.  It further stated that, "[o]nly if [the government] carr[ies] that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect [the challenger's] proposed course of conduct."  Id.

The Supreme Court then reviewed the historical evidence that the government provided.  It clustered the historical evidence into five categories: "(1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries."  Id. at 2135-36.  The Supreme Court did not find the government's evidence regarding any of these categories convincing.  As to the first category, it stated that, "[a]t the very least, we cannot conclude from this historical record that, by the time of the

18

**Add. 18**

founding, English law would have justified restricting the right
to publicly bear arms suited for self-defense only to those who
demonstrate some special need for self-protection." Id. at
2142. As to the second category, it concluded that "in the
century leading up to the Second Amendment and in the first
decade after its adoption, there is no historical basis for
concluding that the pre-existing right enshrined in the Second
Amendment permitted broad prohibitions on all forms of public
carry." Id. at 2145.

> For the third category, it summarized:
>
> The historical evidence from antebellum America
> does demonstrate that **the manner** of public carry
> was subject to reasonable regulation. Under the
> common law, individuals could not carry deadly
> weapons in a manner likely to terrorize others.
> Similarly, although surety statutes did not
> directly restrict public carry, they did provide
> financial incentives for responsible arms
> carrying. Finally, States could lawfully
> eliminate one kind of public carry—concealed
> carry—so long as they left open the option to
> carry openly.

Id. at 2150 (emphasis in Bruen).

> In beginning its discussion of the fourth category,
the Supreme Court relied on Dred Scott, stating that Dred Scott
"indirectly affirmed the importance of the right to keep and
bear arms in public." Id. It further explained that Chief
Justice Taney, writing for the Court in Dred Scott, "recognized
. . . that public carry was a component of the right to keep and

bear arms–a right free blacks were often denied in antebellum America." Id. at 2151. It is important to reiterate that Dred Scott's discussion of a right to bear arms is dictum. See supra Discussion Section I.A. Moreover, to the extent that the mention of a right to bear arms in Dred Scott provides any historical insight into the legal bounds of the Second Amendment, it should be cautioned that it is equally plausible that Chief Justice Taney exaggerated certain rights in a pursuit to justify the enslavement of black Americans. In any event, after some additional historical analysis, the Supreme Court in Bruen concluded that, "[a]s for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century." Id. at 2152.

Finally, in assessing the fifth category, the Supreme Court stated that the late-19th century evidence, particularly as to evidence regarding the newer western states, "cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." Id. at 2154. The Supreme Court ultimately held that:

> At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms

20

**Add. 20**

> in public subject to certain reasonable, well-
> defined restrictions.  <u>Heller</u>, 554 U.S. at 581,
> 128 S. Ct. 2783.  Those restrictions, for
> example, limited the intent for which one could
> carry arms, the manner by which one carried arms,
> or the exceptional circumstances under which one
> could not carry arms, such as before justices of
> the peace and other government officials.  Apart
> from a few late-19th-century outlier
> jurisdictions, American governments simply have
> not broadly prohibited the public carry of
> commonly used firearms for personal
> defense. . . .

<u>Id.</u> at 2156.

### C.    Framework for Analyzing this Nation's Historical Tradition

<u>Bruen</u>'s directive is clear: once an individual's conduct is covered by the plain text of the Second Amendment, the burden is on the government to establish that the regulation is consistent with this Nation's historical tradition of firearm regulation.  <u>See</u> <u>id.</u> at 2129–30.  The exception being, of course, exclusion of firearms in traditionally "sensitive places."  Then, and only then, is a gun regulation constitutional.  Although the burden is on the government to proffer evidence that the regulation is consistent with this Nation's historical tradition of firearm regulation, a reviewing court must analyze the government's proffered historical evidence.  A core element of this analysis is assessing how "the Second Amendment's historically fixed meaning applies to new circumstances . . . ."  <u>Id.</u> at 2132.  This task "will often

**Add. 21**

involve reasoning by analogy" and "[l]ike all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are **relevantly similar**." Id. (emphasis added) (citation and internal quotation marks omitted).

In assessing whether regulations are "relevantly similar under the Second Amendment," courts should look "toward at least two metrics: **how** and **why** the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132–33 (emphases added). But, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory black check." Id. at 2133. "[A]nalogical reasoning requires only that the government identify a well-established and representative **analogue**, not a historical **twin**. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id. (emphases in Bruen).

Relevant here, "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—" the Supreme Court stated it was "aware of no disputes regarding the lawfulness of such prohibitions." Id. (citations omitted). The Supreme Court

22

**Add. 22**

assumed, then, that it was "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment.  And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible."  Id. (emphasis in Bruen).

Moreover, "when it comes to interpreting the Constitution, not all history is created equal.  'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'"  Id. at 2136 (emphasis in Bruen) (quoting Heller, 554 U.S. at 634–35, 128 S. Ct. 2783).  The Supreme Court stated that "courts must be careful when assessing evidence concerning English common-law rights"; it stated, for example: "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice."  Id.  It also "guard[ed] against giving postenactment history more weight than it can rightly bear."  Id.  While it is true that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision[,] . . . . to the extent that history contradicts what the text says, the text controls."  Id.

23

**Add. 23**

at 2137 (citations and internal quotation marks omitted).  That
is, "post-ratification adoption or acceptance of laws that are
**inconsistent** with the original meaning of the constitutional
text obviously cannot overcome or alter that text." Id.
(emphasis in Bruen) (quotation marks and citations omitted).

The Supreme Court also "acknowledge[d] that there is
an ongoing scholarly debate on whether courts should primarily
rely on the prevailing understanding of an individual right when
the Fourteenth Amendment was ratified in 1868 when defining its
scope (as well as the scope of the right against the Federal
Government)." Id. at 2138 (citations omitted).  But, it did
"not address this issue . . . because . . . the public
understanding of the right to keep and bear arms in both 1791
and 1868 was, for all relevant purposes, the same with respect
to public carry." Id.  With this framework and understanding,
this Court turns to the instant case.

## II.  **Preliminary Matters**

### A.  **Standing**

The State contends Plaintiffs lack standing to
challenge Haw. Rev. Stat. §§ 134-A(a)(4), (a)(12), and 134-E.
See Mem. in Opp. at 7, 16, 19.  Because standing goes to the
issue of whether this Court has jurisdiction to hear the case,
the State's argument must be addressed.  See Spokeo, Inc. v.
Robins, 578 U.S. 330, 338 (2016) (stating that the standing

24

**Add. 24**

doctrine "ensure[s] that federal courts do not exceed their authority . . . ." (citation omitted)).  To establish the "irreducible constitutional minimum of standing," a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Id. at 338 (quotation marks and citations omitted).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Id. at 339 (citation and internal quotation marks omitted).

Here, Plaintiffs possess standing to challenge §§ 134-A(a)(4), (a)(12), and 134-E.  As to § 134-A(a)(4), which prohibits carrying firearms in bars and restaurants that serve alcohol, the State argues Plaintiffs "have not identified any bar or restaurant that has authorized (or would authorize) [them] to carry a gun into their premises."  [Mem. in Opp. at 7.]  The State's argument fails because § 134-A(a)(4) flatly bans the carrying of firearms in bars and restaurants that serve alcohol.

The Individual Plaintiffs allege they frequently visit and will continue to visit bars and restaurants that serve alcohol.  See Complaint at ¶¶ 59(H) ("Jason Wolford has in the

past regularly frequented the following areas which are . . .
restaurants that serves alcohol or intoxicating liquor . . . on
the premises, and he has, in the past carried a concealed arm
with his permit in the locations referenced herein, and he
intends to . . . in the future, own, possess, and carry a
firearm with his concealed carry permit in these locations and
locations like them."); 60(H) (same as to A. Wolford); 61(H)
(same as to Kasprzycki). Because they frequently visit these
spaces in their ordinary daily lives, the Individual Plaintiffs
sufficiently establish that they face imminent harm that is
concrete and particularized. See Haw. Rev. Stat. § 134-A(f)
(stating a violation of § 134-A constitute misdemeanors). The
harm is fairly traceable to the State's conduct because the
Individual Plaintiffs face criminal penalties if they are found
to be carrying a firearm in that prohibited spaces. See
O'Handley v. Weber, 62 F.4th 1145, 1161 (9th Cir. 2023) ("[T]he
traceability requirement is less demanding than proximate
causation, and thus the causation chain does not fail solely
because there are several links or because a single third
party's actions intervened." (citations and internal quotation
marks omitted)). Stated another way, "[i]t is possible to draw
a causal line from" the State implementing the challenged
provision to Plaintiffs' potential criminal penalties for

26

**Add. 26**

violating the challenged provisions, "even if [the causal line] is one with several twists and turns." See id. at 1161–62.

The State's argument appears to also rely on § 134-E. That is, because § 134-E requires private commercial owners to give express permission to carry firearms on their property, if a private owner gives permission to carry firearms on their property, then an individual is not penalized and, thus, there is no harm. But, § 134-E does not negate the default ban set forth in § 134-A(a)(4). Before the enactment of § 134-A(a)(4), the Individual Plaintiffs – as licensed firearm carriers – could conceal carry into bars and restaurants serving alcohol without facing criminal penalty. Although the owners of those establishments could prohibit the Individual Plaintiffs from carrying in their establishments, the Individual Plaintiffs did not face criminal penalties.

Despite the possibility that a commercial owner could override the prohibition set forth in § 134-A(a)(4), without more, such a third-party's possible intervention does not destroy the causal chain needed to show traceability. See O'Handley, 62 F.4th at 1161; see also Winsor v. Sequoia Benefits & Ins. Servs., LLC, 62 F.4th 517, 525 (9th Cir. 2023) (stating a plaintiff must allege "a substantial probability" that the defendant caused the alleged harm (citation and internal quotation marks omitted)). Finally, the Individual Plaintiffs'

27

**Add. 27**

injury can also be redressed by a favorable judicial decision
because a favorable judicial decision would enjoin the
restriction set forth in § 134-A(a)(4) and the accompanying
criminal penalty for any violation. The Individual Plaintiffs
therefore have standing to challenge § 134-A(a)(4).[8]

        The State contests Plaintiffs' standing to challenge
§ 134-A(a)(12) for the same reason as it provided for § 134-
A(a)(4). See Mem. in Opp. at 16 ("As with bars and restaurants
serving alcohol, Plaintiffs lack standing because they provide
no allegations or evidence that any financial institution has
authorized (or would authorize) carrying firearms on it
premises."). This Court's analysis in finding that the
Individual Plaintiffs have standing to challenge § 134-A(a)(4)
equally applies to this argument and, therefore, the Individual
Plaintiffs have standing to challenge § 134-A(a)(12).[9] See
Complaint at ¶¶ 59(I) ("Jason Wolford has in the past regularly

_____

[8] In a similar case involving challenges to a New Jersey
regulation for, among other things, restrictions on "sensitive
places" including bars and restaurants serving alcohol, the
district court similarly found that the plaintiffs had standing
to challenge that particular "sensitive place" regulation. See
Koons v. Platkin, Civil No. 22-7464 (RMB/AMD), 2023 WL 3478604,
at *46 (D.N.J. May 16, 2023), appeal filed, 2023 WL 3478601
(June 9, 2023).

[9] Although the State does not contest the Individual
Plaintiffs' standing as to the other challenged provisions under
§ 134-A(a), the Individual Plaintiffs have standing to challenge
those provisions for the same reason they have standing to
challenge §§ 134-A(a)(4) and (a)(12).

frequented . . . banks or financial institutions . . . and has
in the past carried a concealed arm with his permit and intends
to . . . in the future, own, possess, and carry a firearm with
his concealed carry permit in these locations and locations like
them."); 60(I) (same as to A. Wolford); 61(I) (same as to
Kasprzycki).

The State argues Plaintiffs lack standing to challenge
§ 134-E because "property owners could prohibit firearms even if
HRS § 134-E were enjoined, leaving Plaintiffs in the exact same
position." [Mem. in Opp. at 19.] It also contends that,
"because Plaintiffs 'fail[] to provide any statement . . .
indicating that [they] will not seek permission before carrying
in a private property,' they 'fail to establish an injury-in-
fact.'" [Id. at 19 n.35 (alterations in original) (quoting Frey
v. Nigrelli, 21 CV 05334 (NSR), 2023 WL 2473375, at *9 (S.D.N.Y.
Mar. 13, 2023)).[10]] The Individual Plaintiffs submitted
supplemental declarations stating they have been to private
businesses in the County of Maui while carrying a concealed
firearm and would continue to frequent those businesses but for
the threat of prosecution under § 134-E. See Reply, Exh 5 at
PageID.1328-30 (Suppl. Decl. of Jason Wolford) at ¶¶ 3-4; id. at

---

[10] An appeal has been filed. Frey v. Bruen, No. 23-365 (2d
Cir. Mar. 16, 2023).

PageID.1331-33 (Suppl. Decl. of Alison Wolford) at ¶¶ 3-4; id. at PageID.1334-36 (Suppl. Decl. of Atom Kasprzycki) at ¶¶ 8-9.

The State's first argument is not persuasive because, although private businesses could prohibit firearms on their premises, some would not. Plaintiffs provide declarations from some business owners, each stating that the business owner has not displayed a sign allowing the public to carry firearms on the premises, but if § 134-E was no longer in effect, the business owner would allow the public to conceal-carry firearms on the premises. See generally Reply, Exh. 3 (collection of declarations from Maui business owners). The State's second argument also fails because the Individual Plaintiffs have proffered some evidence that, but for § 134-E, they would conceal-carry their firearms on private businesses' properties. Further, the Individual Plaintiffs' declarations imply that before § 134-E became effective they would not seek explicit permission from those businesses. Plaintiffs would conceal carry in businesses in their ordinary daily lives and were not faced with criminal penalty. Insofar as businesses did not display a sign prohibiting the carrying of firearms on their premises, the Individual Plaintiffs could conceal carry freely and the businesses would unlikely be aware that the Individual Plaintiffs were conceal carrying.

**Add. 30**

Accordingly, the Individual Plaintiffs have standing
to challenge § 134-E. Because the Individual Plaintiffs have
standing to pursue their challenges to §§ 134-A(a)(4), (a)(12),
and 134-E, this Court does not address HFC's standing. See
Leonard v. Clark, 12 F.3d 885, 888 (9th Cir. 1993) ("The general
rule applicable to federal court suits with multiple plaintiffs
is that once the court determines that one of the plaintiffs has
standing, it need not decide the standing of the others."
(citation omitted)).

## B.   **Facial and As-Applied Challenges**

Plaintiffs raise facial and as-applied challenges to
the challenged provisions. See, e.g., Complaint at ¶¶ 73-77.
"A facial challenge is . . . a claim that the law or policy at
issue is unconstitutional in all its applications." Bucklew v.
Precythe, 139 S. Ct. 1112, 1127 (2019). "[A] plaintiff can only
succeed in a facial challenge by establish[ing] that no set of
circumstances exists under which the Act would be valid, *i.e.*,
that the law is unconstitutional in all of its applications."
Wash. State Grange v. Wash. State Republican Party, 552 U.S.
442, 449 (2008) (some alterations in Wash. State Grange)
(citation and internal quotation marks omitted).

> Facial challenges are disfavored for several
> reasons. Claims of facial invalidity often rest
> on speculation. As a consequence, they raise the
> risk of "premature interpretation of statutes on
> the basis of factually barebones records." Sabri

31

**Add. 31**

v. United States, 541 U.S. 600, 609 (2004)
(internal quotation marks and brackets omitted).
Facial challenges also run contrary to the
fundamental principle of judicial restraint that
courts should neither "'anticipate a question of
constitutional law in advance of the necessity of
deciding it'" nor "'formulate a rule of
constitutional law broader than is required by
the precise facts to which it is to be applied.'"
Ashwander v. TVA, 297 U.S. 288, 346–347 (1936)
(Brandeis, J., concurring) (quoting Liverpool,
New York & Philadelphia S.S. Co. v. Commissioners
of Emigration, 113 U.S. 33, 39 (1885)).  Finally,
facial challenges threaten to short circuit the
democratic process by preventing laws embodying
the will of the people from being implemented in
a manner consistent with the Constitution.  We
must keep in mind that "'[a] ruling of
unconstitutionality frustrates the intent of the
elected representatives of the people.'"  Ayotte
v. Planned Parenthood of Northern New Eng., 546
U.S. 320, 329 (2006) (quoting Regan v. Time,
Inc., 468 U.S. 641, 652 (1984) (plurality
opinion)). . . .

Id. at 450–51 (some alterations in Wash. State Grange).

     "An as-applied challenge, meanwhile, focuses on the

statute's application to the plaintiff, and requires the court

to only assess the circumstances of the case at hand."

Rodriguez Diaz v. Garland, 53 F.4th 1189, 1203 (9th Cir. 2022)

(citation and internal quotation marks omitted).  "Facial and

as-applied challenges differ in **the extent to** which the

invalidity of a statute need be demonstrated."  Isaacson v.

Horne, 716 F.3d 1213, 1230 (9th Cir. 2013) (emphasis in

Isaacson) (quotation marks and citation omitted).  "While a

successful challenge to the facial constitutionality of a law

**Add. 32**

invalidates the law itself, a successful as-applied challenge
invalidates only the particular application of the law."
Italian Colors Rest. v. Becerra, 878 F.3d 1165, 1175 (9th Cir.
2018) (citation and internal quotation marks omitted).

Importantly, though, the Ninth Circuit has also
stated:

> "[T]he distinction between facial and as-applied
> challenges is not so well defined that it has
> some automatic effect or that it must always
> control the pleadings and disposition in every
> case involving a constitutional challenge."
> Citizens United v. Fed. Election Comm'n, 558 U.S.
> 310, 331, 130 S. Ct. 876, 175 L. Ed. 2d 753
> (2010). Instead, the distinction matters
> primarily as to the remedy appropriate if a
> constitutional violation is found. Id. The
> substantive legal tests used in facial and as-
> applied challenges are "invariant[.]" . . .

Isaacson, 716 F.3d at 1230 (some alterations in Isaacson).

III. **Likelihood of Success on the Merits**

"To establish a substantial likelihood of success on
the merits, [a plaintiff] must show 'a fair chance of success.'"
In re Focus Media, Inc., 387 F.3d 1077, 1086 (9th Cir. 2004)
(quoting Republic of the Philippines v. Marcos, 862 F.2d 1355,
1362 (9th Cir. 1988) (en banc)). This Court reviews each
challenged provision in turn to determine whether Plaintiffs
establish a likelihood of success on the merits on their
respective facial and as-applied challenges.

33

**Add. 33**

**A.    Haw. Rev. Stat. § 134-A(a)(1) –**
**Government Buildings and Adjacent Parking Areas**

Plaintiffs request a TRO to enjoin the portion of § 134-A(a)(1) that prohibits people from carrying a firearm in parking areas adjacent to government buildings.  See TRO Motion, Mem. in Supp. at 24.  During the hearing for the TRO Motion, Plaintiffs' counsel clarified Plaintiffs' challenge to § 134-A(a)(1).  Plaintiffs' counsel stated that Plaintiffs were not seeking to enjoin the portion of § 134-A(a)(1) that covers all parking areas adjacent to government buildings.  Instead, Plaintiffs seek to enjoin § 134-A(a)(1) insofar as it prohibits carrying firearms in the parking areas mentioned in their Complaint and parking areas similar to those listed areas.

Specifically, Plaintiffs challenge the following parking areas and/or parking areas similar to them: the parking area adjacent to Ace Hardware and Ross which shares a parking area with the County of Maui Department of Motor Vehicles ("Maui DMV"); see Complaint at ¶¶ 59(J)(i), 60(J)(i); see also Complaint, Exh. 5 (map depicting the parking area of Ace Hardware, Ross, and the Maui DMV); and the parking area adjacent to D.T. Fleming Beach Park in the County of Maui which shares a parking area with a county or State lifeguard building, see

34

**Add. 34**

Complaint at ¶¶ 60(F)(vii), 61(G)(iv).[11]  This Court therefore
construes Plaintiffs' challenge as an as-applied challenge and
not a facial challenge.  In the hearing on the TRO Motion,
counsel for the State maintained that the State's position
concerning § 134-A(a)(1) is that the word "adjacent" in that
provision related to parking areas means "parking areas that
exclusively serve a particular place."  It appears, then, that
the State's position is that a parking area is adjacent to a
government building if the parking area exclusively serves the
government building.  Section 134-A(a)(1) as written does not
stand for what the State now claims it does.  The State,
however, appears to concede that the parking areas adjacent to
government buildings which are listed in the Complaint are not
considered areas protected by § 134-A(a)(1).

        Plaintiffs' challenge to § 134-A(a)(1) is much
narrower than initially raised in the TRO Motion.  In light of
the parties' updated positions, this Court will only address the
limited challenge to § 134-A(a)(1) insofar as it prohibits
carrying firearms in parking areas adjacent to government
buildings where the parking area: (1) does not exclusively serve
the government building; (2) is not reserved for government

---

[11] During the hearing on the TRO Motion, Plaintiffs' counsel
also stated they are not challenging the prohibition of carrying
firearms in parking areas that are reserved for government
employees.

**Add. 35**

employees, *i.e.*, non-government employees use the parking area;
and (3) shares a parking area with a non-governmental building.
Although the State appears to concede that some of Plaintiffs'
challenged areas are not sensitive places – particularly the two
parking areas listed in the Complaint – this Court must analyze
the challenged areas, nonetheless, because Plaintiffs challenge
portions of § 134-A(a)(1) as written.

This Court begins with determining whether the
regulated conduct in the challenged portion of § 134-A(a)(1) is
covered by the plain text of the Second Amendment.  Section 134-
A(a)(1) prohibits, in part, a person who is licensed to carry or
possess a firearm from carrying or possessing a firearm in
"parking areas" that are "owned, leased, or used by the State or
a county . . . ."  Haw. Rev. Stat. § 134-A(a)(1).  To the extent
that the challenged parking areas are shared with non-government
buildings, do not exclusively serve the government building, and
are not reserved for government employees, they are generally
public spaces.[12]  It is clear, therefore, that the plain text of
the Second Amendment covers the regulated conduct set forth in
§ 134-A(a)(1), as narrowly construed for the present challenge,

---

[12] Neither party explicitly addresses privately owned
parking areas that are held open to the public.  This Court does
not address that issue here, but this Court's discussions
regarding Haw. Rev. Stat. §§ 134-A(a)(4) and 134-E are
applicable to privately owned parking areas that are held to the
public.  See *infra* Discussion Sections III.B, III.E.

36

**Add. 36**

because the Supreme Court has conclusively held that "[t]he Second Amendment's plain text . . . presumptively guarantees . . . a right to 'bear' arms in public for self-defense." See Bruen, 142 S. Ct. at 2135. The question, then, is whether the challenged parking areas are sensitive places such that the State may permissibly limit the general right to carry firearms publicly for self-defense.

Importantly, Heller and Bruen did not concern the issue of determining the legal bounds of "sensitive places." But more importantly, the parties are not in dispute as to the specific areas being challenged by Plaintiffs. That is, the parties agree that the specific parking areas that Plaintiffs seek to enjoin the State from enforcing its firearms ban are **not** sensitive places.

At this stage, the State fails to meet its burden in rebutting Plaintiffs' narrow challenge to § 134-A(a)(1). In fact, the State at oral argument conceded to Plaintiffs' position. For the sake of completeness, however, this Court addresses the State's lack of evidence. In its memorandum in opposition, the State fails to cite to any historical evidence regarding possible analogues to restrictions on parking areas that some government buildings use (limited in scope to the aforementioned areas). This Court is "not obligated to sift the historical materials for evidence to sustain" the State's law.

37

**Add. 37**

See Bruen, 142 S. Ct. at 2150.  "That is [the State's] burden."
See id.  In lieu of historical analogues, the State cites in a
footnote to a case from the Eastern District of Virginia for the
proposition that some parking areas could or should be viewed as
sensitive spaces because they are used by many people including
children.  See Mem. in Opp. at 18 n.33 (citing United States v.
Masciandaro, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009)).

Masciandaro, however, is not binding on this Court, is
not relevant, and, in light of Bruen, is no longer good law.
There, the district court conducted the now-rejected "means-end
scrutiny" analysis and, as such, no historical analysis was
properly conducted.  See Masciandaro, 648 F. Supp. 2d at 789
(stating the challenged regulation survived strict scrutiny,
intermediate scrutiny, or an undue burden analysis).  Although
the district court concluded that parking lots "are even more
sensitive" because "parking lots are extensively regulated
thoroughfares frequented by large numbers of strangers,
including children," see id. at 790, the district court did not
assess any evidence of historical analogues.  The district
court, of course, did not have the benefit of the Bruen analysis
in informing its decision, and therefore the State's reliance on
Masciandaro is unhelpful here.

Section 134-A(a)(1) does not differentiate between
government parking areas.  It is possible that a parking area

adjacent to a post office is not a constitutionally protected
sensitive place whereas the parking area adjacent to the State's
legislative building is a constitutionally protected sensitive
place. This Court makes no finding as to this possibility, but
the State's concessions during the hearing on the TRO Motion
show that the State understands this important distinction.
Section 134-A(a)(1) in its current form does not reflect the
State's now-held understanding.

Because the State fails to "justify" the portion of
§ 134-A(a)(1) that regulates the challenged government parking
areas by "demonstrate[ing] that the regulation is consistent
with this Nation's historical tradition of firearm regulation,"
it is likely that "the Constitution presumptively protects that
conduct." See Bruen, 142 S. Ct. at 2125. Accordingly,
Plaintiffs have a likelihood of success on the merits as to
their as-applied challenge to § 134-A(a)(1); namely, the
challenge to the portions of § 134-A(a)(1) that prohibit
carrying firearms in parking areas owned, leased, or used by the
State or county which share the parking area with non-
governmental entities, are not reserved for State or county
employees, and/or do not exclusively serve the State or county
building.

This Court notes that this conclusion is, and should
be, narrowly construed. The two parking areas listed in the

Complaint, and similarly situated parking areas next to a
government building, fall within the category of areas being
challenged.  The parking area shared by the Maui DMV, Ace
Hardware, and Ross meet at least some of these criteria because
that parking area is shared with non-governmental entities.  As
to the parking area next to the lifeguard station at D.T.
Fleming Beach Park, that parking area is also covered by some of
these criteria because the parking area does not exclusively
serve the lifeguard station; that is, members of the public also
use that parking area when they go to the beach.  To the extent
that there are other parking areas adjacent to a government
building that meet some of these challenged criteria, this Court
does not address the State's argument that those areas are
sensitive places under § 134-A(a)(1) because the State has not
proffered evidence or cited any legal authority to support their
contention.

    **B.   Haw. Rev. Stat. § 134-A(a)(4) – Bars and
          Restaurants Serving Alcohol and Adjacent Parking Areas**

         Plaintiffs also seek a TRO to enjoin § 134-A(a)(4) in
its entirety.  See TRO Motion, Mem. in Supp. at 21-22.  This
Court therefore analyzes this challenge as a facial and as-
applied challenge.  Section 134-A(a)(4) prohibits a person with
a license to carry a firearm from carrying a firearm in "[a]ny
bar or restaurant serving alcohol or intoxicating

**Add. 40**

liquor . . . for consumption on the premises, including adjacent parking areas[.]"  The State argues Plaintiffs fail to satisfy their burden of showing that the plain text of the Second Amendment covers the conduct regulated in § 134-A(a)(4).  See Mem. in Opp. at 7–8.  The State is incorrect.

"The Second Amendment's plain text . . . presumptively guarantees  . . . a right to bear arms **in public** for self-defense."  Bruen, 142 S. Ct. at 2135 (emphasis added) (internal quotation marks omitted).  In analyzing the text of the Second Amendment, the Supreme Court held that the "definition of 'bear' naturally encompasses **public** carry."  Id. at 2134 (emphasis added).  Because "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms[,]" id., it follows that there is nothing in the Second Amendment's plain text that makes a distinction between public places.  The Second Amendment's plain text, therefore, also naturally encompasses places that are generally held open to the public.  To be sure, Bruen uniformly rejected the respondents' argument that a state is permitted "to condition handgun carrying in **areas frequented by the general public** on a showing of a nonspeculative need for armed self-defense in those areas."  See id. at 2135 (emphasis added) (citation and internal quotation marks omitted); see also id. at 2148 ("[T]he surety laws [of the mide-19th century] did not **prohibit** public carry in

41

**Add. 41**

**locations frequented by the general community**." (first emphasis in <u>Bruen</u>)). Put differently, for the respondents in <u>Bruen</u> to justify the regulation, they needed to show that prohibiting the carrying of firearms in areas frequented by the general public was consistent with this Nation's historical tradition. The Supreme Court held that they did not make such a showing.

While bars and restaurants are private businesses, they are generally held open to the public, *i.e.*, they are frequented by the general public. Members of the public have a general invitation or license to enter those businesses' properties. That invitation or license is not absolute, of course, and may be revoked if, for example, an invitee or licensee is engaging in unlawful behavior or behavior that the business deems unacceptable. But, the general rule is that members of the public are welcome to enter those establishments. Thus, the conduct of carrying a firearm in a bar or restaurant that serves alcohol is covered by the plain text of the Second Amendment because those establishments are public to the extent that members of the public are invitees or licensees who may enter those establishments during business hours, unless their invitation or license is revoked.

Although not dispositive of the issue, this understanding of the word "public" also comports with the common use of the word "public" in this general context. See *Public*,

**Add. 42**

BLACK'S LAW DICTIONARY (11th ed. 2019) ("Open or available for all
to use, share, or enjoy.").  The use of the word "public" or
derivations of this word in some Hawai`i laws further
illustrates this common understanding of the word.  Hawaii's
disorderly conduct law, for instance, includes businesses in its
definition of "public place."  See Haw. Rev. Stat. § 711-1101(1)
("A person commits the offense of disorderly conduct if, with
intent to cause physical inconvenience or alarm by a member or
members of the public, or recklessly creating a risk thereof,
the person: . . . . (e) Impedes or obstructs, for the purpose of
begging or soliciting alms, any person in any **public
place** . . . ." (emphasis added)); Haw. Rev. Stat. § 711-1100
("'**Public place**' means a place to which the public or a
substantial group of person has access and includes . . . **places
of amusement or business** . . . ." (emphases added)).

Hawaii's law prohibiting discriminatory practices in
public places incorporates a similar definition.  See Haw. Rev.
Stat. § 489-3 ("Unfair discriminatory practices that deny, or
attempt to deny, a person the full and equal enjoyment of the
goods, services, facilities, privileges, advantages, and
accommodations of a **place of public accommodation** on the basis
of race; sex, including gender identity or expression; sexual
orientation; color; religion; ancestry; or disability, including
the use of a service animal, are prohibited." (emphasis added));

43

**Add. 43**

Haw. Rev. Stat. § 489-2 ("'Place of public accommodation' means a **business** . . . of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the **general public** as customers, clients, or visitors. . . ." (emphases added)). So does Hawaii's laws governing intoxicating liquors. See Haw. Rev. Stat. § 281-1 ("'Public place' means any publicly owned property or **privately owned property open for public use or to which the public is invited for entertainment or business purposes**." (emphasis added)).

Some federal laws similarly classify private businesses held open to the public as public places. See, e.g., 42 U.S.C. § 2000a(a)-(b) (statue prohibiting discrimination or segregation in places of public accommodations and including within "a place of public accommodation" "establishments which serve[] the public" whose "operations affect commerce"). In sum, based on a common understanding of the word "public," it is not controversial for Second Amendment purposes to classify certain private businesses held open to the public – *e.g.*, bars and restaurants serving alcohol – as public places.

Indeed, some district courts have reached the same conclusion that certain locations (and specifically bars and restaurants serving alcohol) held open to the public are covered by the Second Amendment's right to bear arms in public. See,

**Add. 44**

e.g., Koons, 2023 WL 3478604, at *58 ("Plaintiffs' right to carry for self-defense in public naturally encompasses entry onto the property of another, **provided** that such property is held open to the public and entry is otherwise lawful." (emphasis in Koons)); Antonyuk v. Hochul, 1:22-CV-0986 (GTS/CFH), 2022 WL 16744700, at *71 (N.D.N.Y. Nov. 7, 2022) ("The Court finds that the Second Amendment's plain text covers the conduct in question (i.e., carrying a concealed handgun for self-defense in public in any establishment issued a license for on-premise consumption pursuant to . . . the alcoholic beverage control law where alcohol is consumed) . . . ." (first alteration in Antonyuk) (internal quotation marks omitted)), *stayed*, 2022 WL 18228317 (2d Cir. Dec. 7, 2022).

       It is important to note, however, that this conclusion is not without caveats.  The right to bear arms in public is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  See Bruen, 142 S. Ct. at 2128 (quotation marks and citation omitted).  In cases where a business revokes a licensee or invitee's permission to enter the business's property, the business is no longer a public place to that licensee or invitee.  The licensee or invitee's conduct would not be covered by the Second Amendment's plain text in such a scenario.  Similarly, if a business is closed or otherwise restricts access to the public, the business

**Add. 45**

would not be considered to be held open to the public.  This Court's conclusion is narrow; it only concludes that, to the extent that the conduct regulated by § 134-A(a)(4) is covered by the plain text of the Second Amendment, Plaintiffs have met their burden.

Because the plain text of the Second Amendment covers Plaintiffs' conduct of carrying a firearm in a bar or restaurant that serves alcohol, it is presumptively protected under the Constitution.  The burden shifts to the State to justify its regulation by showing that such a regulation is consistent with this Nation's historical tradition of firearm regulation.  The State attempts to establish § 134-A(a)(4)'s constitutionality by citing to "[a] 1746 New Jersey law prohibit[ing] the selling of 'any strong Liquor' to members of the militia[.]"  [Mem. in Opp. at 8 (quoting Mem in Opp., Decl. of Nicholas M. McLean ("McLean Decl."), Exh. 2 (1746 N.J. Laws 301-12 (An Act for better settling and regulating the Militia of this Colony of New Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, ch. 84)) at § 26).]

That law is not relevant here because it restricted militia members from being sold strong liquors.  Such a law may be important to ensure militia members are not intoxicated for the protection and security of the state, but it does not implicate the general public's right to bear arms.  Prohibiting

46

**Add. 46**

militia members from being sold certain types of alcohol is not closely analogous to restricting all individuals who are licensed to publicly carry a firearm from entering a bar or restaurant serving alcohol.

The State also cites to a 1756 Delaware law and a 1756 Maryland law that similarly restricted either militia officers from meeting near an inn or tavern, or militia members from being intoxicated on "any Muster-day." See id. at 8-9 (citing McClean Decl., Exh. 3 (An Act for establishing a Militia in this Government (Delaware, 1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service(Arthur Vollmer, ed. 1947)), pt. 3 at 10-15, Exh. 4 (An Act for Regulating the Militia of the Province of Maryland (1756), *reprinted in* The Selective Serv. Sys., 2 Backgrounds of Selective Service (Arthur Vollmer, ed. 1947)), pt. 5 at 83-108). Those laws are also unpersuasive in finding that there was a national historical tradition of prohibiting members of the public – rather than members of the militia – from public carrying in places serving alcohol.

The same principle holds true for the State's reliance on a 1780 Pennsylvania law that prohibited non-commissioned officers or privates from "parading drunk" and militia companies or battalions from meeting at taverns on days of military exercises. See id. at 9 (citing McLean Decl., Exh. 5 (An Act

47

**Add. 47**

for the Regulation of the Militia of the Commonwealth of
Pennsylvania (1780), ch. 902), § 45 (§ 57, P.L.); § 48 (§ 60,
P.L.), 12th rule, *reprinted in* The Selective Serv. Sys., 2
Backgrounds of Selective Service (Arthur Vollmer, ed. 1947),
pt. 11 at 75-104). Other citations to similar militia laws also
fail for the same reason. See id. at 9 n.13.

    The State further cites multiple laws from the mid- to
late-19th century that regulated firearm possession by
intoxicated individuals. See id. at 9 n.14. For instance, an
1867 Kansas law prohibited "any person under the influence of
intoxicating drink" from "carrying on his person a pistol . . .
or other deadly weapon . . . ." [McLean Decl., Exh. 14 (An Act
to prevent the carrying of Deadly Weapons, ch. 12) at § 1).] An
1883 Missouri law also prohibited any person from carrying a
firearm or other deadly weapon "when intoxicated or under the
influence of intoxicating drinks." [Id., Exh. 15 (An Act to
amend section 1274, article 2, chapter 24 of the Revised
Statutes of Missouri, entitled "Of Crimes and Criminal
Procedure") at § 1.[13]] An 1883 Wisconsin law made it "unlawful
for any person in a state of intoxication, to go armed with any
pistol or revolver." [Id., Exh. 16 (1883 Wis. Sess. Laws 290

---

[13] This Act also prohibited the concealed carrying of
firearms as well as carrying firearms in churches, schools, an
election precinct on election day, courtrooms during court
sessions, among other prohibitions.

**Add. 48**

(An Act to prohibit the use and sale of pistols and revolvers), ch. 329) at § 3.]

Although this Court declines to make a finding as to whether those laws conclusively establish a national historical tradition of regulating intoxicated individuals from carrying firearms, even if such a conclusion were assumed, § 134-A(a)(4) is broader than those laws. Section 134-A(a)(4) prohibits people from carrying firearms in bars and restaurants that **serve alcohol**. It includes individuals carrying in those establishments regardless of whether they are **consuming** alcohol. The historical laws cited by the State do not reach as far as § 134-A(a)(4). Those laws, therefore, do not show a national historical tradition of regulating people from carrying firearms in establishments serving alcohol irrespective of whether the individual carrying is consuming alcohol. For that reason, reliance on those laws is unpersuasive to support the restriction set forth in § 134-A(a)(4).

The State also relies on a few laws prohibiting people from carrying firearms where alcohol is sold. An 1853 New Mexico law, for instance, prohibited people from carrying firearms in a "Ball or Fandango" and "room adjoining said ball where Liquors are sold . . . ." [McLean Decl., Exh. 19 (1853 N.M. Laws 67-69 (An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls)) at § 3.]

49

**Add. 49**

An 1879 New Orleans city ordinance made it unlawful "for any
person to carry a dangerous weapon, concealed or otherwise, into
any . . . tavern . . . ." [Id., Exh. 20 (1879 New Orleans, La.,
Gen. Ordinances (Concealed weapons or otherwise in balls or
theatres), tit. I, ch. 1, art. 1, *reprinted in* Jewell's Digest
of the City Ordinances Together with the Constitutional
Provisions, Act of the General Assembly and Decisions of the
Courts Relative to Government of the City of New Orleans
(Edwin L. Jewell, ed., New Orleans, L. Graham & Son 1882)) at 1-
2.] An 1890 Oklahoma law made it unlawful for a person to carry
a firearm into "any place where intoxicating liquors are
sold . . . ." [Id., Exh. 17 (1890 Okla. Sess. Laws. at 495-96,
ch. 25, art. 47 (Concealed Weapons)) at § 7.[14]] These legal
restrictions focus on the availability or access to alcohol or
intoxicating liquor (not the consumption) and therefore they are
comparable to the statute at issue.

Courts have been cautioned that "the bare existence of
[some] localized restrictions cannot overcome the overwhelming
evidence of an otherwise enduring American tradition permitting
public carry." See Bruen, 142 S. Ct. at 2154. This Court
therefore does not give much weight to the State's reliance on

---

[14] This Act also prohibited the concealed carrying of
firearms in addition to prohibiting carrying firearms in
sensitive areas such as churches, schools, political
conventions, public assemblies, and other areas.

**Add. 50**

the 1879 New Orleans city ordinance, which only represents one
city ordinance and was enacted after the ratification of the
Fourteenth Amendment.  In assessing the 1853 New Mexico law and
the 1890 Oklahoma law here, this Court notes Bruen's warning
against giving such western territorial laws too much weight
because, at the time of the 1890 census, "Arizona, Idaho, **New
Mexico, Oklahoma,** and Wyoming combined to account for only
420,000 of [the roughly 62 million people living in the United
States at the time]—about two-thirds of 1% of the population."
See id. (emphases added) (citation omitted).

    This is confounding.  On one hand, Bruen emphasizes
the need to sift through historical evidence to assess the
tradition of firearm regulations.  On the other, Bruen seems to
dismiss any law enacted unless it was done in a state where a
significant percentage of the people – insofar as they counted
as living in the United States – resided at the time that the
Fourteenth Amendment was enacted.[15]  This is also a curious way
of evaluating the weight of territorial laws.  Where did the
people in the territories, other than the native people who were
not counted in the census, come from?  Some were foreigners but

---

    [15] For instance, Native Americans were not counted as part
of the census until the Census Act of 1879.  See Censuses of
American Indians, U.S. CENSUS BUREAU
https://www.census.gov/history/www/genealogy/decennial_census_re
cords/censuses_of_american_indians.html (last visited Aug. 8,
2023).

**Add. 51**

many were American citizens seeking the opportunity to own land. See, e.g., the Homestead Act of 1862, ch. 75, 12 Stat. 392 (codified at 43 U.S.C. §§ 161-284) (repealed 1976).

The word "tradition" is defined as "an inherited, established, or customary pattern of thought, action, or behavior (such as a religious practice or a social custom)." *Tradition*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/tradition (last visited Aug. 8, 2023). Should this Court consider territorial laws as reflecting the "Nation's historical tradition" because many of the people who moved to the territories came from the states and brought traditional thoughts and ways – legal governance, marriage, agricultural practices, and the like – and enacted laws in the territories reflecting those traditions? That is, where New Mexico, Oklahoma, and New Orleans enacted similar prohibitions, does that reflect the national attitude at that time? Laws restricting the carrying of firearms have been described by some legal scholars as being "widely enacted" by 1867. See, e.g., Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 63-64 (2017). If there is evidence of such laws being widely enacted, although in territories rather than states, is the Court necessarily compelled to discount these laws because the

**Add. 52**

majority national population resided in the states and not in the territories?  <u>Bruen</u> leaves these questions unanswered.

At this point in the matter before this Court, the State has offered few relevant laws and, therefore, this Court cannot conclude on the current record that the State has met its burden in establishing that § 134-A(a)(4) is consistent with this Nation's historical tradition of gun regulation.  That is, the State has failed to show there is a national historical tradition of prohibiting individuals from carrying firearms in bars and restaurants that serve alcohol and their adjacent parking areas.  Accordingly, and based solely on the evidence presented at this point, Plaintiffs are likely to succeed on the merits of their facial and as-applied challenge to § 134-A(a)(4).

**C.   Haw. Rev. Stat. § 134-A(a)(9) –**
**Beaches, Parks, and Adjacent Parking Areas**

Plaintiffs request a TRO to enjoin the portions of § 134-A(a)(9) that prohibit carrying firearms at any beach, park, and adjacent parking area.  <u>See</u> TRO Motion, Mem. in Supp. at 19.  The State first argues that the conduct of carrying a firearm at beaches and parks is not covered by the plain text of the Second Amendment.  <u>See</u> Mem. in Opp. at 10.  The Court rejects the State's argument because beaches and parks in Hawai`i are public areas owned by the State.  <u>See, e.g.,</u> Haw.

Rev. Stat. § 115-1 ("The purpose of this chapter is to guarantee the right of **public access** to the sea, shorelines, and inland recreational areas . . . ." (emphasis added)). Because beaches, parks, and their adjacent parking areas are public areas, the carrying of firearms in those areas is covered by the plain text of the Second Amendment. The burden shifts to the State to offer evidence that § 134-A(a)(9) is consistent with this Nation's historical tradition of gun regulation.

The State contends that, because it owns public parks and beaches, its "role as proprietor weighs in favor of upholding a regulation." [Mem. in Opp. at 11.] The State cites Nordyke v. King, 681 F.3d 1041 (9th Cir. 2012) (en banc), to support its contention, but that case is inapposite. That case concerned an exception to a city ordinance that prohibited the carrying and possession of firearms on county property. See Nordyke, 681 F.3d at 1044. At issue was an exception to the general prohibition, which allowed the possession of a firearm on country property by an authorized participant of an event such as a gun show provided that, when an authorized participant was not in actual possession of the firearm, the firearm was secured. See id. The plaintiffs challenged the exception on Second Amendment grounds, but the Ninth Circuit held that the ordinance was constitutional because it "regulates the sale of firearms at Plaintiffs' gun shows only minimally, and only on

54

**Add. 54**

County property." Id. It further held that the plaintiffs
could not succeed on their claim "no matter what form of
scrutiny applies to Second Amendment claims." Id. at 1045. The
Ninth Circuit in Nordyke, however, predates Bruen and thus could
not apply Bruen's holding that the Second Amendment protects the
right to bear arms **in public**. This Court therefore cannot apply
Nordyke's reasoning to the instant case.

  The State asks this Court to make the distinction
"'between the government exercising the power to regulate or
license, as lawmaker, and the government acting as proprietor,
to manage its internal operation.'" [Mem. in Opp. at 11
(quoting Nordyke, 681 F.3d at 1045 (cleaned up)).] The State
makes this distinction to argue that it may regulate conduct on
its property when it is acting as a proprietor. See id. at 11
n.17 (citations omitted). This distinction in a post-Bruen
world makes no difference. What matters at the first step of
the inquiry is whether the regulated conduct is covered by the
Second Amendment's plain text.

  Relevant here, the determinative issue at the first
step is whether the conduct concerns the public carrying of
firearms irrespective of the proprietary interest the government
possesses. If the government's capacity to act as a proprietor
was a determinative factor in the first step of the analysis,
then the fundamental right of public carry – as expressed fully

**Add. 55**

in Bruen – would be jeopardized.  Indeed, under such a theory, an argument could be made that the government possesses the unfettered power to restrict public carrying of firearms in many – if not most – public places because it has a proprietary interest in those areas.  Whether the government acted as a proprietor may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the Bruen analysis.

        Next, the State argues "the nature of public parks and beaches clearly demonstrates that they are sensitive locations" because "[c]hildren and families congregate at parks and beaches" and "[p]arks and beaches often host crowded gatherings, like concerts, fairs, competitions, and cultural exhibitions, and they are places where important expressive activities occur."  [Mem. in Opp. at 11–12 (footnotes omitted).]  It is beyond question that: children and families congregate at beaches and parks in Hawai`i; beaches and parks are integral and highly valued in Hawaiian culture; and beaches and parks are critical components of Hawaii's economy.  Alas, these considerations by themselves do not matter under the Bruen analysis.  The Supreme Court recognizes that firearms can be prohibited in "sensitive places" consistent with the Second Amendment.  See Bruen 142 S. Ct. at 2133 (recognizing undisputed lawfulness of prohibitions in places such as legislatures,

56

**Add. 56**

polling places, courthouse, schools, and government buildings). But, for firearms to be prohibited in parks and beaches consistent with the Second Amendment, the State must come forth with "analogies to those historical regulations of 'sensitive places'" so this Court can "determine [whether] modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible." See id. (emphasis in Bruen). The record is absent of analogies to historical "sensitive places" for parks and beaches.

The State does not provide any evidence that this Nation has a historical tradition of regulating or prohibiting the carrying of firearms on beaches. Instead, it appears to analogize gun regulations regarding beaches with gun regulations regarding parks. Fair enough, this Court will therefore consider the issue of beaches and parks as operating under the same analysis. The State begins with the proposition that "[t]here were no modern-style parks in the era of the Second Amendment." See Mem. in Opp., Expert Decl. of Saul Cornell ("Cornell Decl.") at ¶ 55;[16] see also id. at ¶ 56 ("The creation of parks as we now know them began in the middle of the nineteenth century . . . ."). Plaintiffs, however, point to

---

[16] Saul Cornell is "the Paul and Diane Guenther Chair in American History at Fordham University." [Cornell Decl. at ¶ 3.]

**Add. 57**

reports that the Boston Common, established in 1634, served as a site for informal socialization, recreation, sports, entertainment, and celebrations.  See TRO Motion, Mem. in Supp. at 19 (quoting Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021)).  They further argue the City Hall Park in New York City "began as a 'public common' in the 17th century," and "New York's Bowling Green Park was established 'for the Recreation & Delight of the Inhabitants of [New York] City' in 1733."  Id. at 19-20 (alteration by Plaintiffs) (quoting *The Earliest New York City Parks*, N. Y. City Dep't. of Parks and Recreation, available at https://on.nyc.gov/3hBZXfe (last visited June 23, 2022)).

The question becomes whether parks at the ratification of the Second Amendment were sufficiently similar to today's parks.  If so, then an assessment must be made as to whether, at the time of the Second Amendment's ratification, guns were regulated in a similar manner as the State's gun regulation concerning parks.  The State appears to argue that parks, as we view them today, did not become common place until around 1850 and, therefore, the relevant historical period to scrutinize in determining the historical tradition of gun regulation involving parks should begin in 1850.  This Court addresses each scenario; namely, it addresses whether there is a historical tradition of

**Add. 58**

gun regulation, at the time of the Second Amendment's ratification, limiting public carry at parks when parks are (1) viewed similarly with modern parks or (2) not viewed similarly with modern parks.  Under either scenario, however, the State fails to meet its burden.

If, during the time of the Second Amendment's ratification, parks were sufficiently analogous to parks today, as Plaintiffs contend, then the State has not proffered evidence that there was a historical tradition of prohibiting the carrying of firearms in parks.  Plaintiffs have proffered some evidence that shows some cities in the 1700's had some form of a public park.  Because the State has not presented any evidence, it has not met its burden.  See Koons, 2023 WL 3478604, at *83 ("Despite the existence of such common lands since the colonial period, the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks.").

If, during the time of the Second Amendment's ratification, parks were not sufficiently analogous to modern parks, as the State argues, then it urges this Court to consider the gun laws around the mid-19th century – when parks became more akin to modern parks – to determine whether § 134-A(a)(9) is consistent with those laws.  The State's position is misplaced.  The test in Bruen does not direct courts to look at

59

**Add. 59**

when a historical place became akin to the modern place being regulated. Rather, the focus is on "determining whether a historical **regulation** is a proper analogue for a distinctly modern firearm **regulation**" which "requires a determination of whether two **regulations** are relevantly similar." See Bruen, 142 S. Ct. at 2132 (emphases added) (citation and internal quotation marks omitted). The distinction is subtle, yet materially significant. See, e.g., id. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." (emphasis, citation, and internal quotation marks omitted)).

As such, the inquiry must start with comparing the challenged regulation and a historical analogue that is relevantly similar, if one exists. For purposes of the TRO Motion, the Court finds that parks around 1791 were not comparable to modern parks. The States' burden is thus to demonstrate a historical tradition of gun regulation prohibiting the carrying of firearms in public spaces that were relevantly similar to parks. The State relies on: an 1858 ordinance adopted by the Board of Commissioners of New York's Central Park prohibiting people from carrying firearms within the park; an 1866 ordinance adopted by the Commissioners of Prospect Park in

60

**Add. 60**

the City of Brooklyn with a similar prohibition as the 1858 ordinance; and an 1868 Pennsylvania law prohibiting people from carrying firearms or shooting birds in Fairmount Park in Philadelphia. See McLean Decl., Exhs. 21 (1858 N.Y.C., N.Y. *in* Minutes of Proceedings of the Board of Commissioners of the Central Park for the Year ending April 30, 1958, (New York, Wm. C. Bryant & Co. 1858)) at 166-68, 22 (1873 Brooklyn, N.Y., Park Ordinances (Ordinance No. 1), *reprinted in* Annual Reports of the Brooklyn Park Commissioners 1861-1873 (1873) at 136, art. 1) at § 4, 23 (1868 Pa. Laws 1083-90 (A Supplement to an act entitled "An Act appropriating ground for public purposes in the City of Philadelphia"), pt. II) at § 21.

The 1858 and 1866 ordinances were local ordinances, not state laws, passed by the respective board of commissioners, both within New York. Local ordinances reflect the citizenry's values in the most basic and essential way. Moreover, since the parks were under local – not state – governance, it is not surprising that state laws were silent about permissible conduct in the parks. The two ordinances were enacted by one of the most populous states at the time, but the two ordinances reflect only New York's historical tradition of gun regulations. Taking these ordinances into account along with the 1868 Pennsylvania law, the State's evidence establishes that, at the time of the Fourteenth Amendment's ratification in 1868, only about 4% of

**Add. 61**

this Nation had a historical tradition of prohibiting carrying firearms in parks. [17]  Even if the laws established a tradition of regulating carrying firearms in certain parks in Pennsylvania and New York, this Court cannot conclude that these laws sufficiently establish this Nation's historical tradition of gun regulation in parks by 1868.

Finally, the State cites numerous local ordinances that regulated firearms in parks, but those ordinances are from 1872 through 1886.  See Mem. in Opp. at 15 (citations omitted). Because those local ordinances were passed after the Fourteenth Amendment's ratification in 1868, the Court is constrained in considering them as to the Nation's historical tradition of gun regulation at the time of either the Second Amendment's ratification or the Fourteenth Amendment's ratification.  See Bruen, 142 S. Ct. at 2136 ("[W]e must also guard against giving postenactment history more weight than it can rightly bear."). [18]

---

[17] The population of the United States was 31,443,321 in 1860 with New York's population reported as 3,880,735 and Pennsylvania's population reported as 2,906,215.  See U.S. CENSUS BUREAU, https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-1-p2.pdf (last visited Aug. 8, 2023), at Table VII (Population of states and territories, arranged geographically: 1790 to 1900), pg. xxii.

[18] The Supreme Court in Bruen "avoid[ed] another ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 or when the Bill of Rights was ratified in 1791."  142 S. Ct. at 2163 (Barrett, J.,
(. . . continued)

62

**Add. 62**

The State further contends "[t]here is a robust historical tradition of restricting guns in places like parks and beaches."  [Mem. in Opp. at 14.]  It relies on a recent District of Maryland case, Maryland Shall Issue, Inc. v. Montgomery County, --- F. Supp. 3d ----, Civil Action No. TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023),[19] to support its position.  There, the district court found that the plaintiffs were not likely to succeed on the merits of their challenge to a Maryland regulation prohibiting the carrying of firearms at public parks, recreational facilities, and multipurpose exhibition facilities.  See Md. Shall Issue, 2023 WL 4373260, at *12.  After reviewing some historical laws, the district court concluded that those laws "demonstrate that there is 'historical precedent' from before, during, and after the ratification of the Fourteenth Amendment that 'evinces a comparable tradition of regulation' of firearms in parks."  Id. at *11 (quoting Bruen, 142 S. Ct. at 2131–32).  To the extent that the State relies on Maryland Shall Issue to support § 134-A(a)(9)'s restriction on

---

concurring) (citation and internal quotation marks omitted).  Regardless of that debate, the reliance on local ordinances that were enacted **after the ratification** of the Fourteenth Amendment cannot sufficiently assist in determining the prevailing understanding of the right to bear arms in public **at the time of ratification**.

[19] An appeal has been filed.  Md. Shall Issue, No. 23-1719 (4th Cir. July 10, 2023).

publicly carrying firearms in parks and on beaches, this Court respectfully disagrees with that district court's finding that the laws it reviewed demonstrate a national historical tradition of prohibiting carrying firearms in parks.

The district court there relied on the following laws and ordinances:

> an **1857 ordinance** stating that "[a]ll persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles" within Central Park in New York City, see First Annual Report on the Improvement of the Central Park, New York at 106 (1857); an **1870 law** enacted by the Commonwealth of Pennsylvania stating that "[n]o persons shall carry fire-arms" in Fairmount Park in Philadelphia, Pennsylvania, see Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870); an **1895 Michigan state law** providing that "No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles" within a park in the City of Detroit, see 1895 Mich. Local Acts at 596, § 44; and a **1905 ordinance** in Chicago, Illinois stating that "all persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks . . . of the City," 1905 Chi. Revised Mun. Code, ch. XLV, art. I, § 1562. Similar restrictions were enacted to bar the carrying of firearms in (I) Saint Paul, Minnesota, see Annual Reports of the City Officers and City Boards of the City of Saint Paul at 689 (**1888**); (2) Williamsport, Pennsylvania, see **1891** Williamsport, Pa. Laws and Ordinances at 141, § 1; (3) Wilmington, Delaware, see **1893** Wilmington, Del. Charter, Part VII, § 7; (4) Reading, Pennsylvania, see A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (**1897**); (5) Boulder, Colorado, see **1899** Boulder, Colo. Revised Ordinances at 157, § 511; (6) Trenton, New Jersey, see **1903** Trenton, N.J. Charter and

64

**Add. 64**

Ordinances at 390; (7) Phoenixville,
Pennsylvania, <u>see</u> A Digest of the Ordinances of
Town Council of the Borough of Phoenixville at
135, § 1 (**1906**); (8) Oakland, California, <u>see</u>
**1909** Oakland, Cal. Gen. Mun. Ordinances at 15,
§ 9; (9) Staunton, Virginia, <u>see</u> **1910** Staunton,
Va. Code, ch. II, § 135; and (10) Birmingham,
Alabama, <u>see</u> **1917** Birmingham, Ala. Code,
ch. XLIV, § 1544.

On a state level, in **1905,** Minnesota
prohibited the possession of firearms within
state parks unless they were unloaded and sealed
by a park commissioner. 1905 Minn. Laws,
ch. 344, § 53. In **1917,** Wisconsin prohibited
bringing a "gun or rifle" into any "wild life
refuge, state park, or state fish hatchery lands"
unless it was unloaded and in a carrying case.
1917 Wis. Sess. Laws, ch. 668, § 29.57(4). In
**1921,** North Carolina enacted a law prohibiting
the carrying of firearms in both private and
public parks without the permission of the owner
or manager of that park. <u>See</u> 1921 N.C. Sess.
Laws 53–54, Pub. Laws Extra Sess., ch. 6, §§ 1,
3.

<u>Md. Shall Issue</u>, 2023 WL 4373260, at *11 (alterations in <u>Md.
Shall Issue</u>) (emphases added) (some citations omitted).

In finding that the cited laws demonstrated a national

historical tradition of carrying firearms in parks, the district

court relied on only one local ordinance that was in effect

prior to the Fourteenth Amendment's ratification. The other

sixteen laws or ordinances were passed after the Fourteenth

Amendment's ratification, and nine of those laws were passed in

the twentieth century. Of the sixteen laws and ordinances

passed after the Fourteenth Amendment's ratification, fifteen of

**Add. 65**

those were passed **at least** twenty years after the Fourteenth Amendment's ratification.

Put another way: out of the seventeen laws the district court reviewed, only one local ordinance was enacted before the Fourteenth Amendment's ratification and only one state law was enacted "during" the time of the Fourteenth Amendment's ratification.[20]  This Court is not convinced that evidence of one local ordinance and one state law is sufficient to find that there was a national historical tradition of prohibiting the carrying of firearms in parks at the time of the Fourteenth Amendment's ratification.  As to the other fifteen laws passed at least twenty years after the Fourteenth Amendment's ratification, this Court is constrained from placing too much "weight" on "postenactment history" given Bruen's directive to determine whether the modern prohibition against the carrying of firearms has a historical analogue that was clearly established at either the Second Amendment's ratification or the Fourteenth Amendment's ratification.  See Bruen, 142 S. Ct. at 2136.

---

[20] The 1870 Commonwealth of Pennsylvania law was enacted around two years after the Fourteenth Amendment's ratification, but this Court will consider the enactment as "during" the Fourteenth Amendment's ratification for the sake of argument.

**Add. 66**

Additionally, the ten most populated cities reviewed by the district court – New York City, Chicago, Philadelphia, Detroit, St. Paul, Wilmington, Trenton, Oakland, Birmingham, and Williamsport – amounted to roughly 9.3% of the total population of the United States in 1900.[21]  See U.S. CENSUS BUREAU, https://www2.census.gov/library/publications/decennial/1900/volume-1/volume-1-p2.pdf (last visited Aug. 8, 2023), at Table XXII (Population of cities having 25,000 inhabitants or more in 1900, arranged according to population: 1880 to 1900), pgs. lxix–lxx. This is certainly more than 4%, but what percentage that must be reached to find national representation and whether the general population of the United States must be considered when, presumably, there were at least some states, cities, or counties that did not have parks at the time are inquiries not considered in Bruen.  Based on the record before it, this Court cannot find that the laws and ordinances cited in Maryland Shall Issue, which covered, at most, less than ten percent of the United States' population, are sufficient to restrict this Nation's history and tradition of an individual's right to carry firearms

---

[21] Although some of the ordinances or laws were enacted before or after 1900, this Court uses 1900 as a general time period to illustrate that these laws and ordinances did not reflect the state of the law applicable to the vast majority of the Nation.

**Add. 67**

in public.[22]  The State's reliance on <u>Maryland Shall Issue</u> is
therefore unpersuasive.

      The State fails to meet its burden to show that there
is a national historical tradition prohibiting carrying firearms
in parks.  Because the State argues beaches are analogous to
parks to support its restriction on beaches, the State also
fails to meet its burden showing that there is a national
historical tradition prohibiting carrying firearms on beaches.
Finally, the State does not provide any evidence that
prohibiting carrying firearms in parking areas adjacent to parks
and beaches is consistent with this Nation's history and
tradition of gun regulation.  Accordingly, Plaintiffs are likely
to succeed on the merits of their facial and as-applied
challenge to the portions of § 134-A(a)(9) that prohibit
carrying firearms at beaches, parks, and their adjacent parking
areas.  <u>See</u> <u>Koons</u>, 2023 WL 3478604, at *85 ("Plaintiffs have
thus established a reasonable likelihood of success on their
Second Amendment challenge to Chapter 131's prohibition on
handguns at parks, beaches, and recreation areas, as well as the

---

[22] This Court is wary about calculating the percentage of
states' populations and it does not think comparing percentages
is dispositive.  This Court also does not make a finding as to
what percentage of the Nation's population is needed to be under
similar regulations to find a historical tradition, but less
than ten percent is likely too low of a percentage to represent
the Nation's population as a whole.

state regulation banning handguns at state parks."); Antonyuk, 2022 WL 16744700, at *67 (similar finding).

### D. Haw. Rev. Stat. § 134-A(a)(12) – Banks, Financial Institutions, and Adjacent Parking Areas

Plaintiffs also request a TRO to enjoin § 134-A(a)(12) in its entirety. See TRO Motion, Mem. in Supp. at 23. That provision prohibits carrying a firearm on "[t]he premises of any bank or financial institution . . . , including adjacent parking areas[.]" Haw. Rev. Stat. § 134-A(a)(12).

The State argues "banks and financial institutions plainly are sensitive locations where carrying firearms may be restricted[,]" in part because "[a]s the Hawai`i Bankers Association testified during legislative hearings on Act 52, 'the elevated risk of danger in bank crimes that involve firearms' means that 'it makes good policy sense and is appropriate to restrict firearms on bank premises.'" [Mem. in Opp. at 16 (citation omitted).] Bankers may raise good policy concerns related to allowing guns in their businesses, but policy concerns like these, by themselves, are irrelevant under Bruen when state restrictions on carrying firearms are under consideration. Policy concerns might be relevant insofar as they help the government "identify a well-established and representative historical analogue" to the regulation at issue. Bruen, 142 S. Ct. at 2133 (emphasis omitted). The State,

**Add. 69**

however, does not argue how these policy concerns negate the
Second Amendment's plain text.  As with § 134-A(a)(4) – the
provision prohibiting carrying firearms in restaurants and bars
serving alcohol – the plain text of the Second Amendment covers
carrying firearms in banks because they are held open to the
public.  See *supra* Discussion Section III.B.  Thus, insofar as
banks are held open to the public and do not revoke the general
license or invitation to enter, they are public places for
purposes of the Second Amendment.  The onus is on the State to
rebut the presumption that carrying firearms in banks is
constitutionally protected conduct.

> In Bruen, the Supreme Court stated:

>> The test that we set forth in Heller and
>> apply today requires courts to assess whether
>> modern firearms regulations are consistent with
>> the Second Amendment's text and historical
>> understanding.  In some cases, that inquiry will
>> be fairly straightforward.  For instance, **when a
>> challenged regulation addresses a general
>> societal problem that has persisted since the
>> 18th century, the lack of a distinctly similar
>> historical regulation addressing that problem is
>> relevant evidence that the challenged regulation
>> is inconsistent with the Second Amendment.** . . .

142 S. Ct. at 2131 (emphasis added).  Here, the inquiry is
"fairly straightforward" because banks and firearms existed at
the time of the Second Amendment's ratification.  Plaintiffs
point to a few banks that existed around the time of the
founding.  See TRO Motion, Mem. in Supp. at 23 (citing Todd

70

**Add. 70**

Wallack, Which bank is the oldest? Accounts vary, THE BOSTON GLOBE
(Dec. 20, 2011, 12:00 AM),
https://www.bostonglobe.com/business/2011/12/20/oldest-bank-
america-accounts-vary/WAqvIlmipfFhyKsx8bhgAJ/story.html).  The
State does not challenge Plaintiffs' contention.  It is likely
that "the elevated risk of danger in bank crimes that involve
firearms" has persisted since 1791.  See Mem. in Opp. at 16
(quotation marks and citation omitted).  The State's lack of
evidence regarding regulations prohibiting carrying firearms in
banks is telling and suggests "that the challenged regulation is
inconsistent with the Second Amendment."  See Bruen, 142 S. Ct.
at 2131.  The State also does not make any argument that this
Court should analogize to different historical regulations
because banks at the time of the Second Amendment's ratification
are substantially different than modern banks.  Without more,
the State has not met its burden.

          Despite the existence of banks and firearms at the
time of the Second Amendment's ratification, the State urges
this Court to consider historical evidence that purportedly
shows a tradition of prohibiting the carrying of firearms in
fairs and markets.  See Mem. in Opp. at 17 (citations omitted).
Because the State does not establish that prohibiting the
carrying of firearms in banks or financial institutions is a
"modern regulation[] that w[as] unimaginable at the founding,"

71

**Add. 71**

see Bruen, 142 S. Ct. at 2132, this Court need not consider whether § 134-A(a)(12) is "relevantly similar" to a historical analogue, see id. (quotation marks and citation omitted).  Yet, for the sake of completeness, this Court addresses the State's reliance on historical regulations that it contends is relevantly similar to § 134-A(a)(12).

The State cites a case from the Southern District of New York, Frey, 2023 WL 2473375, to support its position that there is "a long historical tradition of prohibiting firearms in sensitive commercial centers."  See Mem. in Opp. at 17. Relevant to the State's reliance on Frey, the district court there considered whether a regulation prohibiting carrying firearms in the Time Square area was constitutional under the Second Amendment.  See 2023 WL 2473375, at *16-17.  In finding that the plaintiffs did not establish a substantial likelihood of success on the merits to challenge the regulation, the district court relied in part on a 1786 Virginia law and a 1792 North Carolina law which "contain[ed] a 'fairs' and 'markets' prohibition . . . ."  See id. at *16.  The district court noted that it was persuaded with the defendants' argument that the regulation was "in line with the historical tradition of banning firearms in locations where **large groups of people congregated for commercial, social, and cultural activities**."  Id. at *17 (emphasis added).

**Add. 72**

Here, the State likewise depends on the 1786 Virginia law and the 1792 North Carolina law. See Mem. in Opp. at 17. It appears, then, that the State contends banks and financial institutions are relevantly similar to large gathering places like fairs, markets, or Time Square.[23]  This Court finds that the State fails to establish such an analogue.  The State does not argue or show that there is a feature that sufficiently connects banks to fairs or markets.  Unlike in Frey, where the district court found that Time Square was similarly relevant to historical fairs and markets because of the large congregation of people, here banks are not likely to be so congested or heavily congregated such that they are akin to a place like Time Square.  If they are similar in that regard, the State fails to establish the similarity.  The State instead asks this Court to take its word for it.  This Court cannot do so.

In addition, the State fails to make any showing that similar prohibitions in adjacent parking areas are consistent with this Nation's historical tradition of gun regulation. Because the State has failed to show that § 134-A(a)(12) is consistent with this Nation's historical tradition of gun

---

[23] The State also cites to a string of laws from the 1800s that prohibited carrying firearms in social gatherings, see Mem. in Opp. at 18 n.31, but those laws are unavailing for a substantially similar reason as the 1786 Virginia law and the 1792 North Carolina law.

**Add. 73**

regulation, Plaintiffs have a likelihood of success on the merits of their facial and as-applied challenge to § 134-A(a)(12).

### E. Haw. Rev. Stat. § 134-E – Private Property and Express Authorization

Plaintiffs' final request is a TRO to enjoin § 134-E because, as they argue, it violates the Second Amendment right to carry firearms in public, and the portion of § 134-E requiring private property owners to give express authorization to carry on their property violates the First Amendment.  See TRO Motion, Mem. in Supp. at 14-18.  This Court turns first to Plaintiffs' Second Amendment challenge.

#### 1. Second Amendment Challenge

The State contends the conduct that § 134-E regulates – *i.e.*, carrying a firearm on private property without express authorization – is not covered by the Second Amendment's plain text.  See Mem. in Opp. at 19.  Plaintiffs argue § 134-E "enacts . . . a presumption against carrying firearms in property open to the public."  [TRO Motion, Mem. in Supp. at 15.]  The parties are both correct to a certain extent.  Section 134-E regulates carrying firearms on private properties that are, at least sometimes, held open to the public, such as some "commercial, industrial, agricultural, institutional, or undeveloped propert[ies] . . . ."  See Haw. Rev. Stat. § 134-E(c).  To the

74

**Add. 74**

extent that § 134-E regulates private properties held open to
the public, it is covered by the Second Amendment's plain text.
See *supra* Discussion Sections III.B., III.D.  The portion of
§ 134-E that regulates private property not held open to the
public – *e.g.*, residential properties – is not covered by the
Second Amendment's plain text.

The State argues "HRS § 134-E does no more than
vindicate the traditional right to exclude by preventing
Plaintiffs from carrying firearms onto private property absent
the owner's consent."  [Mem. in Opp. at 20.]  But, § 134-E is
not needed to "**vindicate** the traditional right to exclude," see
id. (emphasis added), because since the time of the founding,
"[o]ur law holds the property of every man so sacred, that no
man can set his foot upon his neighbor's close without his
neighbor's leave," see Florida v. Jardines, 569 U.S. 1, 8 (2013)
(quotation marks and citation omitted).  The State asserts "the
Second Amendment does **not** include a right to carry guns on
others' property without their consent," see Mem. in Opp. at 19
(emphasis in original), but that is inaccurate.  The Second
Amendment guarantees a right to carry a firearm in public, which
includes private properties held open to the public so long as
those places are not sensitive areas as evidenced by this
Nation's historical tradition.  If an owner of a private
property that is held open to the public revokes a general

**Add. 75**

license or invitation, then the property is no longer held open
to the public and, therefore, the right to carry on that
property is not presumptively protected under the Second
Amendment.  Similarly, because the Second Amendment concerns the
public carrying of firearms, it is silent as to private property
not held open to the public.

In other words, and contrary to the State's assertion,
the Second Amendment **does** grant a presumptive right to carry on
**some** private property, insofar as the private property is held
open to the public.  That presumption can change, for instance,
if an owner of the private property rescinds a general license
or invitation to enter the property: such as limiting entrance
to members or prohibiting certain attire.  There is no conflict
between the two rights – the right to bear arms and the right to
exclude others from one's property – both of which preexisted
the ratification of the Bill of Rights.  See, e.g., Bruen, 142
S. Ct. at 2142 ("[B]y the time of the founding, the right to
keep and bear arms was understood to be an individual right
protecting against both public and private violence." (citation
and internal quotation marks omitted)); Jardines, 569 U.S. at 7–
8.

What § 134-E does, and what cannot be constitutionally
permitted, is remove the presumption of the right to carry a
firearm on private property held open to the public.  Under

**Add. 76**

§ 134-E, conduct that was presumptively protected under the
Second Amendment is now presumptively not protected. Such a
change runs afoul of the Second Amendment's "guarantee[] to all
Americans [of] the right to bear commonly used arms in public
subject to certain reasonable, well-defined restrictions." See
Bruen, 142 S. Ct. at 2156 (citation and internal quotation marks
omitted).

The State argues "[t]here is extensive historical
support for prohibitions on carriage on private property without
consent, and for governmental regulation of this conduct."
[Mem. in Opp. at 21.] In support of its contention, the State
cites three laws from the mid- to late-19th century:

-an 1865 Louisiana law prohibiting "any person or persons to
    carry fire-arms on the premises or plantations of any
    citizen, without the consent of the owner or proprietor";
    [id., Exh. 43 (1865 La. Acts 14-16 (An Act To prohibit the
    carrying of fire-arms on premises or plantations of any
    citizen, without the consent of the owner), no. 10), § 1;]

-an 1866 Texas law prohibiting "for any person or person to
    carry fire-arms on the enclosed premises or plantation of
    any citizen, without the consent of the owner or
    proprietor"; [id., Exh. 44 (1866 Tex. Gen. Laws 90 (An Act
    to prohibit the carrying of Fire-Arms on premises or
    plantations of any citizens without the consent of the
    owner), ch. 92) at § 1;] and

-an 1893 Oregon law prohibiting "any person, other than an
    officer on lawful business, being armed with a gun, pistol,
    or other firearm, to go or trespass upon any enclosed
    premises or lands without the consent of the owner or
    possessor thereof," [id., Exh. 45 (1893 Or. Laws 79 (An Act
    To Prevent a Person from Trespassing upon any Enclosed
    Premises or Lands not His Own Being Armed with a Gun,

**Add. 77**

Pistol, or other Firearm, and to Prevent Shooting upon or
from the Public Highway)) at § 1].

The State also cites to five laws from the 1700's:

-a 1715 Maryland law that was passed "to prevent the abusing,
hurting or worrying of any stock of hogs, cattle or horses,
with dogs, or otherwise," and prohibited "any person . . .
that ha[s] been convicted of any of the crimes aforesaid,
or other crimes, . . . that shall shoot, kill or hunt, or
be seen to carry a gun, upon any person's land, whereon
there shall be a seated plantation, without the owner's
leave . . . ."; [id., Exh. 38 (1715 Md. Laws 88-91 (An Act
for the speedy trial of criminals, and ascertaining their
punishment in the county courts when prosecuted there, and
for payment of fees due from criminal persons), ch. 26) at
§ VII;]

-a 1721 Pennsylvania law prohibiting "any person or persons"
from "carry[ing] any gun or hunt[ing] on the improved or
inclosed lands of any plantation other than his own, unless
he have license or permission from the owner . . . ."; 
[id.; Exh. 39 (1721 Pa. Laws, ch. 246, (An Act to prevent
the killing of deer out of season, and against carrying of
guns or hunting by persons not qualified)) at § III,
*reprinted in* 3 James T. Mitchell & Henry Flanders, The
Statutes at Large of Pennsylvania from 1682 to 1801  (Pa.,
Clarence M. Busch, 1896);]

-a 1722 New Jersey law prohibiting "any Person or Persons" from
"carry[ing] any Gun, or Hunt[ing] on the Improved or
Inclosed Lands in any Plantation, and on other than his
own, unless he have Lisence or Permission from the
owner . . . ."; [id.; Exh. 40 (1722 N.J. Laws 141-42 (An
Act to prevent the Killing of Deer out of Season, and
against Carrying of Guns and Hunting by Persons not
qualified) at 141;]

-a 1763 New York law prohibiting "any Person or Persons
whatsoever, other than the Owner, Proprietor, or Possessor"
from "carry[ing], shoot[ing], or discharg[ing] any Musket,
Fowling-Piece, or other Fire-Arm whatsoever, into, upon, or
through any Orchard, Garden, Corn-Field, or other inclosed
Land, whatsoever, within the City of New York . . . without
License in Writing first had and obtained for that Purpose
from such Owner, Proprietor, or Possessor . . . ."; [id.,
Exh. 41 (1763 N.Y. Laws, ch. 1233 (An Act to prevent

hunting with Fire-Arms in the City of New York, and the Liberties Thereof)) at § 1, *reprinted in* 1 Laws of New-York from The Year 1691, to 1773 Inclusive 441-42 (N.Y., Hugh Gaine 1774);] and

-a 1771 New Jersey law prohibiting "any Person or Persons" from "carry[ing] any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful possession, unless he hath License or Permission in Writing from the Owner or Owners or legal Possessors . . . . ," [id., Exh. 42 (1771 N.J. Laws 343-347, ch. 540 (An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns)) at § 1)].

These eight laws do not support the State's contention that this Nation has a historical tradition of prohibiting the carrying of firearms on private property held open to the public. Those laws concern prohibiting carrying firearms on enclosed premises or plantations. The definitions of the relevant words in those laws are helpful in establishing that the laws concerned private property like residential lands, which were not generally held open to the public. The word "enclose" means "[t]o surround or encompass; to fence or hem in all sides." *Enclose*, BLACK'S LAW DICTIONARY (11th ed. 2019). In relation to land, "enclosed land" means "[l]and that is actually enclosed and surrounded with fences." *Land*, BLACK'S LAW DICTIONARY (11th ed. 2019). Moreover, the word "plantation" means "[a]n estate or large farm . . . ." *Plantation*, OXFORD ENGLISH DICTIONARY (3d ed. Revised June 2006). Because those eight laws prohibited carrying firearms on private property that consisted of fenced off lands or estates, the laws did not likely concern private

**Add. 79**

property that was generally held open to the public.
Accordingly, the conduct regulated in those laws are not covered
by the Second Amendment's plain text.

The only law out of those eight laws that does not use
the words "enclosed," "inclosed," or "plantation," is the 1771
New Jersey law which prohibited persons from carrying firearms
on "any [l]ands" not their own.  See McLean Decl., Exh. 42.
Even assuming this meant any private property regardless of
whether it was held open to the public, one New Jersey law does
not show that such a law was "representative" of the laws
applicable throughout the Nation.  See Bruen, 142 S. Ct. at
2133.  The State's reliance on these laws is therefore
unpersuasive.  The State has not established that the portion of
§ 134-E that prohibits carrying firearms on private property
held open to the public is consistent with this Nation's
historical tradition of gun regulation.  Because the State has
not met its burden, Plaintiffs are likely to succeed on the
merits of their challenge to § 134-E to the extent that § 134-E
prohibits carrying firearms on private property held open to the
public.  Plaintiffs are not likely to succeed on the merits of
their challenge to § 134-E to the extent that § 134-E prohibits
carrying firearms on private properly not held open to the
public.  Plaintiffs' facial challenge is therefore unlikely to

**Add. 80**

succeed, but their as-applied challenge regarding private property held open to the public is likely to succeed.

## 2.  **First Amendment Challenge**

Plaintiffs next contend § 134-E(b) requires them to engage in compelled speech in violation of the First Amendment. See TRO Motion, Mem. in Supp. at 18–19.  Section 134-E prohibits carrying firearms on private property unless the property owner gives "express authorization."  Haw. Rev. Stat. § 134-E(b). Plaintiffs argue § 134-E "requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign."  [TRO Motion, Mem. in Supp. at 19.]  Plaintiffs are mistaken.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech."  Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 138 S. Ct. 2361, 2371 (2018).  This includes laws that "compel[] individuals to speak a particular message" so as to "alter the content of their speech."  See id. (brackets, quotation marks, and citations omitted).  Compelled-speech violations "result[] from the fact that the complaining speaker's own message [is] affected by the speech it [is] **forced** to accommodate."  See Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 63 (2006) (emphasis added).

81

**Add. 81**

Here, Plaintiffs', and particularly Kasprzycki's,
message is not affected by any speech they are forced to
accommodate. Kasprzycki is not forced to speak at all. If he
chooses to allow clients to carry firearms on his business's
property, then he may do so. He determines whether he wants to
give express authorization. He is not required to say anything.
There is no coercion. There is no specific message Plaintiffs
must speak. Therefore, § 134-E does not regulate speech within
the scope of the First Amendment. Plaintiffs are not likely to
succeed on the merits of their facial and as-applied challenge
to § 134-E on the ground that it compels speech in violation of
the First Amendment.

## IV. **Irreparable Harm**

"A plaintiff seeking preliminary relief must
'demonstrate that irreparable injury is likely in the absence of
an injunction.'" California v. Azar, 911 F.3d 558, 581 (9th
Cir. 2018) (quoting Winter v. Nat. Res. Def. Council, Inc., 555
U.S. 7, 22, 129 S. Ct. 365 (2008) (emphasis omitted)).
"Irreparable harm is traditionally defined as harm for which
there is no adequate legal remedy, such as an award of damages."
Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir.
2014) (citation omitted). The Ninth Circuit "has ruled that
speculative injury does not constitute irreparable injury
sufficient to warrant granting a preliminary injunction. A

82

**Add. 82**

plaintiff must do more than merely allege imminent harm
sufficient to establish standing; a plaintiff must **demonstrate**
immediate threatened injury as a prerequisite to preliminary
injunctive relief." Boardman v. Pac. Seafood Grp., 822 F.3d
1011, 1022 (9th Cir. 2016) (emphasis in Boardman) (brackets,
citation, and internal quotation marks omitted). "A threat of
irreparable harm is sufficiently immediate to warrant
preliminary injunctive relief if the plaintiff is likely to
suffer irreparable harm before a decision on the merits can be
rendered." Id. at 1023 (citing Winter, 555 U.S. at 22, 129 S.
Ct. 365 (quoting 11A Charles A. Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 2948.1 (2d ed. 1995))).

Plaintiffs argue they will face irreparable harm per
se because their constitutional rights have been violated. See
TRO Motion, Mem. in Supp. at 24. The Court finds that
Plaintiffs have sufficiently established they will likely face
immediate irreparable harm. "It is well established that the
deprivation of constitutional rights 'unquestionably constitutes
irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002
(9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96
S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). The Ninth Circuit does
"not require a strong showing of irreparable harm for
constitutional injuries." Cuviello v. City of Vallejo, 944 F.3d
816, 833 (9th Cir. 2019).

83

**Add. 83**

Neither the Supreme Court nor the Ninth Circuit have addressed whether a violation of the Second Amendment "unquestionably constitutes irreparable injury." See Melendres, 695 F.3d at 1002 (quotation marks and citation omitted). In Elrod, the Supreme Court held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373 (citation omitted). The Ninth Circuit in Melendres applied the same principle to violations of the Fourth Amendment's protection against unreasonable searches and seizures. See 695 F.3d at 1002. So has the Ninth Circuit for violations of the Fifth Amendment's Due Process Clause. See Hernandez v. Sessions, 872 F.3d 979, 994-95 (9th Cir. 2017). A court in this district also applied the same principle to violations of the Fifth Amendment's Takings Clause, made applicable to the State by the Fourteenth Amendment. See Haw. Legal Short-Term All. v. City and Cnty. of Honolulu, Case No. 22-cv-247-DKW-RT, 2022 WL 7471692, at *11 (D. Hawai`i Oct. 13, 2022).

This Court finds no reason not to apply the principle relied on in Elrod, Melendres, Hernandez, and Hawai`i Legal to violations of the Second Amendment because "[t]he constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." See Bruen, 142 S. Ct. at

84

**Add. 84**

2156 (citation and internal quotation marks omitted). To the extent that this Court finds that Plaintiffs are likely to succeed on the merits on some of their challenges, this Court also finds that they will likely face irreparable harm for the probable violation of their Second Amendment rights.

Additionally, Plaintiffs sufficiently establish that the irreparable harm is immediate because they intend to continue to carry their firearms in accordance with their permits in places where carrying firearms are now prohibited. They are therefore likely to be in violation of the challenged provisions now that they are in effect, and will likely face criminal penalties.

The State contends that a finding of immediate irreparable harm is unwarranted because Plaintiffs purportedly delayed in filing their TRO Motion. See Mem. in Opp. at 24. Specifically, the State asserts Plaintiffs delayed because they did not file their action until three weeks after Governor Green signed the Act into law. Plaintiffs state they did not delay because they filed their action eight days before the challenged provisions became effective. See Reply at 15.

> It is generally recognized that a "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm," Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1377 (9th Cir. 1985), but "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper."

85

**Add. 85**

> Aguayo ex rel. N.L.R.B. v. Tomco Carburetor Co.,
> 853 F.2d 744, 750 (9th Cir. 1988). "Usually,
> delay is but a single factor to consider in
> evaluating irreparable injury"; indeed, "courts
> are loath to withhold relief **solely on that
> ground**." Arc of Cal. v. Douglas, 757 F.3d 975,
> (9th Cir. 2014) (emphasis added) (quoting Lydo
> Enters., Inc. v. City of Las Vegas, 745 F.2d
> 1211, 1214 (9th Cir. 1984)).

Cuviello, 944 F.3d at 833 (alteration and emphasis in Cuviello).
Filing before the challenged provisions became effective is not
likely to result in an unreasonable delay. But, even assuming
that Plaintiffs delayed to a certain extent in bringing the TRO
Motion, in light of the likelihood of success on the merits and
the likelihood of immediate irreparable harm, this Court
declines to withhold relief on that basis only. Thus,
Plaintiffs have shown that they will likely face immediate
irreparable harm.

## V.    Balancing of the Equities and Public Interest

"Generally, public interest concerns are implicated
when a constitutional right has been violated, because all
citizens have a stake in upholding the Constitution." Preminger
v. Principi, 422 F.3d 815, 826 (9th Cir. 2005) (citation
omitted); see also Melendres, 695 F.3d at 1002 ("[I]t is always
in the public interest to prevent the violation of a party's
constitutional rights." (quotation marks and citation omitted)).

The State argues the interest in protecting public
safety strongly weighs against issuing a TRO because of the

**Add. 86**

dangers and safety concerns associated with firearms.  See Mem.
in Opp. at 25.  In their Reply, Plaintiffs rely on an amicus
brief submitted by Amici Gun Owners of America, Inc., Second
Amendment Law Center, Hawaii Rifle Association, California Rifle
& Pistol Association, Inc., Gun Owners of California, and Gun
Owners Foundation to rebut the safety issues the State raises.[24]
See Reply at 15; see also the GOA Amici's amicus brief in
support of Plaintiffs' TRO Motion, filed 7/14/23 (dkt. no. 53)
("GOA Amicus Brief").  According to the GOA Amicus Brief, the
vast majority of individuals in the United States with concealed
carry permits are law-abiding.  See GOA Amicus Brief at 20-25
(discussing the statistics of people with concealed carry
permits to support the proposition that people with concealed
carry permits are significantly less likely to commit gun-
related crimes).  Although the State raises important safety
concerns, it fails to demonstrate that the public safety
concerns overcome the public's interest in preventing
constitutional violations.

This is particularly relevant for this analysis
because the challenged provisions only affect those individuals
who have been granted a permit to carry firearms, either openly
or concealed.  See, e.g., Haw. Rev. Stat. § 134-A(a) (stating

---

[24] For the sake of simplicity, this Court refers to this
group of Amici as "the GOA Amici."

**Add. 87**

that the statute, including the twelve enumerated sensitive
areas, apply to "[a] person with a license issued under
section 134-9, or authorized to carry a firearm in accordance
with title 18 United States Code section 926B or 926C . . . .");
see also Haw. Rev. Stat. § 134-9 (listing the requirements an
applicant must meet to be issued a carry permit, which is
granted by the chief of police of a county).  Further,
Plaintiffs allege that, prior to Bruen, the counties within the
State "had only issued less than a half-dozen carry concealed
permits in the prior decades[.]"  [Complaint at ¶ 28 (citing
Young v. County of Hawaii, 142 S. Ct. 2895).]  As such, the
challenged provisions only impact a substantially small subset
of gun owners and, thus, the State's public safety argument is
not persuasive.  Although it is possible post-Bruen that more
conceal carry permits are eventually issued in Hawai`i, that
alone does not negate Plaintiffs' position that the vast
majority of conceal carry permit holders are law-abiding.  See,
e.g., GOA Amicus Brief at 21-22 (stating that Texas in 2020 had
1,4441 convictions for aggravated assault with a deadly weapon
but only four of those convictions were people with valid
concealed carry permits – roughly 0.278% of the total).

       Based on the foregoing, this Court finds that the
balance of the equities and the public interest weigh in favor
of issuing a TRO.  The public has an interest in preventing

constitutional violations, and the State has not established a factual basis for the public safety concerns regarding permit-carrying gun-owners who wish to exercise their Second Amendment right to carry a firearm in public.

**VI.  <u>Summary of this Court's Ruling</u>**

Plaintiffs have established a substantial likelihood of success on the merits of their: as-applied challenge to § 134-A(a)(1); facial and as-applied challenges to §§ 134-A(a)(4), (a)(12), and the portions of § 134-A(a)(9) prohibiting the carrying of firearms in beaches, parks, and their adjacent parking areas; and as-applied challenge to § 134-E on the ground that it violates the Second Amendment, applicable to the State through the Fourteenth Amendment.  For these challenges, Plaintiffs have also sufficiently established that they will face immediate irreparable harm and that the public interest and the balancing of the equities weigh in favor of issuing a TRO. Accordingly, the TRO Motion is granted in part, to the extent that these challenged provisions (or challenged portions of the respective provisions) are enjoined.

Conversely, insofar as Plaintiffs have abandoned their facial challenge to § 134-A(a)(1), they have not established a substantial likelihood of success on the merits of that challenge.  Plaintiffs also have not established a substantial likelihood of success on the merits of their: facial challenge

**Add. 89**

to § 134-E on the ground that it violates the Second Amendment, applicable to the State through the Fourteenth Amendment; and facial and as-applied challenge to § 134-E on the ground that it violates the First Amendment, applicable to the State through the Fourteenth Amendment. Because Plaintiffs fail to establish a substantial likelihood of success on the merits of these challenges, Plaintiffs' TRO Motion is denied as to those challenges.

This Court notes, however, that these rulings could be changed at the preliminary injunction stage because the State may be able to proffer adequate evidence to meet its burden as to any of the challenges. Thus, it is important to understand that the State's failure to provide sufficient evidence as to some of the challenges at this stage is not necessarily fatal at the preliminary injunction stage, assuming the State is able to provide more evidence to meet its burden under Heller and Bruen.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction,[25] filed June 23, 2023, is HEREBY GRANTED IN PART AND DENIED IN PART. The TRO Motion is GRANTED to the extent that the following provisions are enjoined:

---

[25] Again, this Order only addresses the portion of the motion seeking a TRO.

90

**Add. 90**

-the portions of § 134-A(a)(1) that prohibit carrying firearms
    in parking areas owned, leased, or used by the State or a
    county which share the parking area with non-governmental
    entities, are not reserved for State or county employees,
    or do not exclusively serve the State or county building;

-the entirety of §§ 134-A(a)(4) and (a)(12);

-the portions of § 134-A(a)(9) prohibiting the carrying of
    firearms in beaches, parks, and their adjacent parking
    areas; and

-the portion of § 134-E that prohibits carrying firearms on
    private properties held open to the public.

The TRO Motion is DENIED in all other respects.

                IT IS SO ORDERED.

                DATED AT HONOLULU, HAWAII, August 8, 2023.



                                        /s/ Leslie E. Kobayashi
                                        Leslie E. Kobayashi
                                        United States District Judge

**JASON WOLFORD, ET AL. VS. ANNE E. LOPEZ, ETC.; CV 23-00265 LEK-WRP; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Add. 91**

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3
    JASON WOLFORD, et al.,          )  CV 23-00265 LEK-WRP
4                                   )
            Plaintiffs,             )
5                                   )  Honolulu, Hawaii
      vs.                           )  July 28, 2023
6                                   )
    ANNE E. LOPEZ, et al.,          )  [7]PLAINTIFFS' MOTION FOR
7                                   )  TEMPORARY RESTRAINING ORDER
            Defendants.             )  AND PRELIMINARY INJUNCTION
8   _____)

9
                 TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Plaintiffs:        ALAN A. BECK, ESQ.
13                             Law Office of Alan Beck
                               2692 Harcourt Drive
14                             San Diego, California 92123

15                             KEVIN GERARD O'GRADY, ESQ.
                               Law Office of Kevin O'Grady, LLC
16                             1164 Bishop Street, Suite 1605
                               Honolulu, Hawaii 96813
17
    For the Defendants:        BEN GIFFORD
18                             MARY B. MCCORD
                               SPECIAL DEPUTY ATTORNEYS GENERAL
19                             Institute for Constitutional
                               Advocacy & Protection
20                             Georgetown University Law Center
                               PO Box 211178
21                             Brooklyn, New York 11221
                               *Pro Hac Vice*
22
                               DANA A. RAPHAEL, SOLICITOR GENERAL
23                             Hogan Lovells US LLP
                               555 Thirteenth Street, N.W.
24                             Washington, DC 20004
                               *Pro Hac Vice*
25

2

```
 1   APPEARANCES CONTINUED:

 2   For the Defendants      NICHOLAS MATTHEW MCLEAN
     (continued):           FIRST DEPUTY SOLICITOR GENERAL
 3                          KALIKO'ONALANI D. FERNANDES
                           SOLICITOR GENERAL
 4                          Office of the Attorney General-Hawaii
                           425 Queen Street
 5                          Honolulu, Hawaii 96813

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Official Court Reporter:  Debra Read, RDR
                              United States District Court
22                            300 Ala Moana Boulevard
                              Honolulu, Hawaii 96850
23                            readit3949@gmail.com

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

**Add. 93**

3

```
1    FRIDAY, JULY 28, 2023                        10:32 A.M.
2              THE COURTROOM MANAGER:  I'll go ahead and bring the
3    public in, do a few public reminders, and then call in the
4    judge.
5         If you're an observer on the call, please keep your line
6    muted at all times.  All hearings are strictly prohibited from
7    being recorded or broadcast, in whole or in part, in any
8    fashion.
9         If you're joining in from the public line, please ensure
10   that your line is muted.  My understanding is that you can all
11   hear your own conversations on the line, but you can't as well,
12   as the proceeding, so if you could mute yourself, that would be
13   great to assist with other people who are listening in on the
14   call.
15        Let's see.  When addressing the Court, please make sure
16   that you unmute yourself.  When you're not addressing the
17   Court, please mute yourself during that progress.
18        All right?  Thank you.  One moment, I'll call the judge.
19        Hi, Your Honor.  Can you hear me?
20             THE COURT:  I can.  You may go ahead and call the
21   case.  Thank you.
22             THE COURTROOM MANAGER:  Thank you.
23        The United States District Court for the District of
24   Hawaii with the Honorable Leslie E. Kobayashi, United States
25   District Judge presiding, is now in session.
```

UNITED STATES DISTRICT COURT

**Add. 94**

4

 1          Civil No. 23-00265 LEK-WRP, Jason Wolford, et al., versus

 2     Anne E. Lopez.

 3          This matter is set for -- on a plaintiffs' motion for

 4     TRO.

 5          Counsel, please make your appearances for the record,

 6     starting with plaintiffs' counsel.

 7          MR. BECK:  Alan Beck for the plaintiffs, Your Honor.

 8     Good morning.

 9          THE COURT:  Good morning, Mr. Beck.

10     Mr. O'Grady.

11          MR. O'GRADY:  Good morning, Your Honor.

12     Kevin O'Grady on behalf of the plaintiffs.

13          THE COURT:  All right.  And on behalf of the State

14     of Hawaii and Attorney General Lopez?

15          MS. FERNANDES:  Good morning, Your Honor.

16     Kaliko'onalani Fernandes, Solicitor General, for

17     defendant Anne Lopez.

18     I have with me here today Nicholas McLean, First Deputy

19     Solicitor General, and Mary McCord, Ben Gifford, and Dana

20     Raphael, Special Deputy Attorneys General.  Mr. Gifford will be

21     handling today's argument.

22          THE COURT:  All right.  Well, good morning to all of

23     you, and thank you for designating and letting me know that

24     Mr. Gifford will be addressing the oral argument.

25          So we'll first start, of course, with counsel for

UNITED STATES DISTRICT COURT

**Add. 95**

1    Mr. Wolford.  I did want to assure all counsel that, you know,

2    we have looked closely at *Bruen* and its -- you know, it's prior

3    Supreme Court cases with regard to the Second Amendment, so I'd

4    like to assure you that you don't need to go into the framework

5    with regard to the analysis.

6         And if you could address the specifics, with regard to

7    Mr. Wolford's counsel, I particularly have a few questions, and

8    I'll start with the parking areas adjacent to buildings or

9    offices owned, leased, or used by the state or county, and

10   adjacent grounds and parking areas.

11        So my question is directed with regard to an

12   acknowledgement that the buildings that they're adjacent to are

13   sensitive places.  The Supreme Court has recognized that.  They

14   haven't told us why or what the analysis is for sensitive

15   places, but have merely stated it.

16        And so what we're talking about these adjacent areas, my

17   question is -- and I'm happy to hear your other arguments with

18   regard to it -- but specifically are these adjacent parking

19   areas akin to curtilage under a Fourth Amendment analysis?  Is

20   it an extension of a sensitive place?  And if so, whose burden

21   is it?

22        Does the State even have to come forth with any argument

23   because assuming court's already informed us that the buildings

24   themselves are sensitive places and these are adjacent and

25   therefore an extension of that?  Or, do I look at, for

1  instance, *United States v. Dunn*, a Supreme Court case talking

2  about the four factors of the curtilage question:  One,

3  proximity of the area claimed to be curtilage; two, whether

4  there is included in an closure surrounding the home; three,

5  the nature of the uses to which the area's put; and, four,

6  steps taken by the resident to protect the area from

7  observation by people passing by?  Clearly they're all on

8  point, the four factors, but some concept like that.

9      I do note like the state capital, the adjacent parking

10  areas are actually within the footprint, you know, of the

11  capital, and yet you have something like where city hall is

12  where there's a walkway that connects the parking areas.

13      So if you could address that with regard to the parking

14  areas, and then I have a couple other areas I'd like you to

15  address, but then I'm sure you have other arguments to make.

16      So who will be arguing on behalf of Mr. Wolford?  All

17  right, Mr. Beck, please.

18          MR. BECK:  Good morning, Your Honor.

19      As a additional matter, I'd like to clarify our -- what

20  we're challenging today in regards to parking lots and

21  government buildings.

22          THE COURT:  Okay.

23          MR. BECK:  We -- we have specific locations, for

24  example, KT Flemming Beach.  And just an additional matter, I

25  am not that familiar with Maui, so I want to just say that in

7

1   advance, but there's a beach all my clients go to and that
2   beach has a life guard building, not a life guard tower but
3   actual government building on it, and that's one location.
4   Another location is the DMV.  And there are -- there's
5   a -- that they simply want to go to.
6       We're not -- on that issue we're not making a broad
7   challenge to the parking lot of every government building.
8   It's -- and taking the beach at the parking lot at KT Flemming
9   Beach, for example, we don't believe that it's a sensitive
10  place.  However, assuming it is for purposes of addressing the
11  Court's question, I think that maybe the *Dunn* case isn't
12  exactly analogous, but I think the analysis in the *Class* case,
13  which the defendants cite to, actually gives us a lot
14  of -- illuminates this issue.
15      In *Class*, the DC Court of Appeals made a special
16  carve-out for that specific parking lot because it was right
17  next to the capitol building.  It was a government
18  employees' -- only government employees could park there.  And
19  in that situation, they deemed that special parking lot to be a
20  government -- to be a sensitive place.  And a similar argument
21  might be made for, say, a capital building parking lot where
22  only the -- where only employees can go to.  I'm -- I don't
23  want to get too specific, but, you know, I mean, just an
24  example, the capital building, it has -- at the bottom level
25  there's a parking lot.  I'm talking about the Hawaii capital

UNITED STATES DISTRICT COURT

**Add. 98**

1   building.

2          THE COURT:  Right.  I understand.

3          MR. BECK:  And, you know, there's a good argument

4   potentially if we were challenging that specific location where

5   that might be a location where the government might want to not

6   have firearms taken to it.  We're not conceding that; we're

7   just simply saying that's a much different challenge than what

8   we are discussing here.

9          We're discussing a isolated building that's at a beach,

10  just as one example, and people that -- with the parking lots

11  clearly open to the public and people are wanting to go to the

12  beach and there happens to be a building right there.

13         Another example is if -- at certain parks, you know,

14  there might be a ranger station or something like that where,

15  you know, it's a very large park, you know, and there happens

16  to be within that -- within that park a building and then on

17  the other side there's a parking lot.  And that's much

18  different analysis than what the court used in *Class*.

19         Also in *Bondi* which the State also cites to -- in *Bondi*

20  the court used a -- made it clear that, one, it was applying

21  intermediate scrutiny, but in addition to that, the parking lot

22  in *Bondi*, even under intermediate scrutiny which has now been

23  abrogated because of *Bruen*, they were actually conducting

24  business in that parking lot as part of the Postal Service's

25  just day-to-day, you know, operations.

9

1          THE COURT:  Understood.  So am I to understand your

2     argument that you're limiting to these two specific locations,

3     and because you're really arguing that the government activity

4     that's going on in these locations that are adjacent to the

5     parking lots aren't really sensitive areas, so therefore, it

6     can't -- there cannot be a carve-out or something that might be

7     related to, and further, that these parking areas are open to

8     the general public as opposed to limited to the specific

9     purpose of conducting government business such as like a poll

10    place, or court, or et cetera?

11         MR. BECK:  Yes, Your Honor, except we're not

12    limiting it just to those two places.  In our complaint we have

13    a number of other places, for example, in the parks, just an

14    example.  I mean, I think the most glaring is KT Flemming

15    Beach, but there are other areas within our complaint.  I

16    just -- and many of the parks we're going to they have maybe,

17    say, a ranger station, just an example, you know, and what we

18    want is to make sure we get complete relief if our -- if,

19    assuming this Court rules in our favor, just for example in the

20    park ban, we don't want them to not be able to carry there just

21    because there happens to be a -- a park -- a ranger station or

22    something along that line.

23         But the general statement that Your Honor's making is

24    correct in the sense that we're not simply challenging, saying

25    the parking lot at the federal courthouse, just as an

UNITED STATES DISTRICT COURT
**Add. 100**

10

1    example --

2            THE COURT:  Right.

3            MR. BECK:  -- you know.

4            THE COURT:  Understood.  Okay.  Anything else with

5    regard to that?  And then I wanted to move on to the bars and

6    restaurants.

7            MR. BECK:  There's a -- one point I just would like

8    to make that I didn't address in my brief is the State said

9    there's a administrative -- this is in the irreparable harm

10   section of their argument which is why I overlooked it.

11   There's a footnote that says that there were preexisting

12   restrictions in government parking lots, and that's -- and I

13   looked up that administrative code, and all it says in there is

14   that there were -- you only could carry if done so in a lawful

15   manner.  So a person with a CCW prior to implementation of

16   SB 1230 would have been able to legally carry in a government

17   parking lot.

18           THE COURT:  All right.  Thank you for that

19   clarification.

20       All right.  So turning then to the bar or restaurants, so

21   the State has, you know, come up with some examples, and I

22   understand what you're saying with regard to the, you know,

23   forbidding, you know, members of the military and so forth

24   drinking, so I agree with you with regard to those.  But then

25   they've brought up some other ones from territories at the time

1  barring the sale of alcohol in certain locations that one could

2  infer are analogous to bars or restaurants serving alcohol.

3        So I guess two things.  I understand -- and I don't want

4  to put words in your mouth that, you know, you're saying

5  territorial law really shouldn't be taken into account or has

6  less weight -- but where are we in terms of how many historical

7  analogs does the State need to come up with?  Is it the number?

8  Is it when it occurred?  Is it the weight because it's happened

9  in the colonies as opposed to the territories?  What's your

10  position with regard to that?

11        MR. BECK:  Well, as a preliminary matter, I think

12  that we are bound by 1791.  The primary support that the State

13  had in their brief is the *Bondi* case, the 11th Circuit.  And it

14  was actually the same day -- I don't fault them for -- within

15  the hour of them filing their brief the 11th Circuit had

16  abrogated that and it's taken that case en banc.

17        And so beyond that, there's not really a lot of support

18  for the proposition that 1868, the ratification of the

19  Fourteenth Amendment, should be used, and I think the most

20  practical thing -- reason is it doesn't make a lot of sense for

21  the federal government to be under one standard and for the

22  states to be under another standard 'cause at least the theory

23  for using the 1868 is that's when the Bill of Rights was

24  incorporated to the states.  So there can't be any real valid

25  argument that the federal government would use 1868 as the

12

1   proper time frame.

2       And if the courts -- this Court -- you know, if courts in

3   general were to start using 1868, then that would mean that

4   there's two different standards of time frames to be used, one

5   for the federal government and one for the state government.

6   There's no other area of constitutional law where that applies.

7       And, you know, I know you've already read my briefing so

8   I won't go into details of the statute, but we already have a

9   lot of quotations regarding that.  So I think that's our first

10  here.

11      And in the -- as for how many, I think we need to have a

12  majority of the -- of colonial states, colonies -- maybe they

13  could have been territories -- you know, colonies prior to

14  1790.  You know what I mean, Your Honor.

15      THE COURT:  Yes, I do.

16      MR. BECK:  Yeah.  But, you know, I think it has to

17  be a majority.  We have a citation from the Supreme Court where

18  this was after, I think -- yeah, this is a modern era case.

19  We're discussing 13 states isn't enough to create a tradition.

20  And, yeah, this is the one where there was 50 states.  I mean,

21  so I think we know that whatever that percentage is, it has to

22  be greater than that, and it just seems that from the Supreme

23  Court's standpoint they're looking for a real tradition.  A

24  tradition is going to be something that's majority, something

25  that was widely accepted during the founding era, Your Honor.


UNITED STATES DISTRICT COURT

**Add. 103**

1     And I believe there was a third issue that you wanted me

2 to address, but I can't remember, Your Honor.

3          THE COURT:  No, I think that's fine.  That's great.

4     And then my last area, and then I'll let you argue

5 whatever or point out to me whatever you want, my questions are

6 with regard to the beaches.

7     So during the founding era, you know, beaches were used

8 much differently than they currently are and particularly here

9 in Hawaii.  So there really -- there's not going to be a

10 historical analog, that's for sure.

11     And I understand your folks' position is that you want me

12 to look at it in the same analysis as parks, and then you have

13 those examples with the Boston Commons, et cetera.

14     But where there is a location that really didn't exist,

15 has no counterpart in -- to its modern-day location,

16 particularly when it involves, you know, commercial and

17 recreational use, is it of any value or consideration for the

18 court to look at cultural practices and history for states

19 where, like Hawaii, beaches have played an integral role in the

20 community, government, and society?  Is that something that I

21 should consider as part of the analysis, or you think that

22 because it wasn't part of the colonies at the time that it

23 should be of no matter?

24          MR. BECK:  Well, I think, Your Honor, that because

25 we're challenging a state law that bans carry completely on

UNITED STATES DISTRICT COURT

**Add. 104**

14

1  beaches and that's, you know, at Waikiki, that's at Sandy's,
2  you know, that's any beach, especially on the outer islands
3  where it's much more rural than Oahu, it's -- we can't take in
4  the specific cultural practices.

5      I think that would be a little bit of a different
6  analysis, though, if the state law had a ban on -- well, little
7  bit of a cop-out -- but polling places that happen to be on
8  beaches.  That's not a good example.  But if they had a -- I
9  know we're post *Bruen*.  I don't mean it in that sense.  If the
10 law was crafted in a way where it wasn't all beaches but
11 instead it was these specific beaches when -- or in these
12 specific circumstances that traditionally people were able to
13 carry, you know, and cited to those specific historical
14 practices, or maybe even other cultural practices.

15      But here in a situation where it's just simply a carte
16 blanche ban on all beaches, I think we are bound to simply look
17 at what was happening at beaches in general, you know, at 1791.
18 And if the State were to come back, it would be a little bit of
19 a different law that wasn't quite so expansive, and let's just
20 say, you know, you can't carry when this specific event is
21 going on, then they can, you know, cite back, Hey, there's a
22 historical tradition here of not allowing carry at this type of
23 event on a beach or specifically analogize some other way, you
24 know.

25      But in light of the fact this is just simply a broad ban

UNITED STATES DISTRICT COURT
**Add. 105**

15

1    on beaches, I don't think that's something we can do in this
2    particular circumstance, Your Honor.
3              THE COURT:  Okay.  I think I understand your
4    argument.  For instance, the City of Refuge on the island of
5    Hawaii, historically, you know, people were given protection
6    and safety and no one was allowed to bring any kind of weapon
7    in that area, and if you reached the City of Refuge, then you
8    couldn't be arrested or punished or what have you.  You had a
9    period of grace and -- but no one was allowed to bring weapons.
10             So what I hear you saying -- I'm not saying you're
11   conceding this as to that area and that beach -- but that if it
12   was specifically identified and based on those cultural
13   reasons, then you're saying there might be a case for it.
14             But where you're saying if they have a general ban on all
15   beaches, it'd be inappropriate for the court to take a look at
16   the historical and cultural significance of beaches and how it
17   was used during the same period of time, you know, 1791.
18             MR. BECK:  Yeah, that's essentially my argument.
19   You know, I mean, what popped into my head is because we're
20   talking about Maui County.
21             THE COURT:  Yes.
22             MR. BECK:  Molokai, there's that particular -- with
23   the priest -- there's a particular county --
24             THE COURT:  Father Damien, you mean?
25             MR. BECK:  Yes, Your Honor.


UNITED STATES DISTRICT COURT
**Add. 106**

1        THE COURT:  You talking about Kalaupapa?

2        MR. BECK:  Yes, I mean, something like that.  I

3   mean, this is completely beyond the scope of this case but --

4        THE COURT:  Right.

5        MR. BECK:  -- I'm just simply saying that, you know,

6   if there was some -- if the legislature came back and came back

7   with a -- something that wasn't just plain beach ban, this is

8   an analysis we could really look into, but I just don't think

9   that's the case here, Your Honor.

10       THE COURT:  Understood.  Anything else that you wish

11  to argue before the court before I turn to the State's counsel?

12       MR. BECK:  Just on the topic of beaches, Your Honor?

13       THE COURT:  Anything else with regard to your

14  petition for a temporary restraining order.

15       MR. BECK:  Well, I just -- I know I pointed this out

16  in the briefing, but I just want to be very clear that the

17  State's position is in -- that carry's been banned in state

18  parks since 1990, that's simply not the case.

19       I looked up the administrative code, and any argument on

20  irreparable harm failing because of that just can't be

21  done -- isn't valid because the ban was you couldn't carry in a

22  way that would harass animals.  It was perfectly valid up until

23  the passage of SB 1230 to carry with a -- in a lawful, safe

24  manner with the CCW, Your Honor.

25       And -- but beyond that, I'll -- I'm hopeful the Court

UNITED STATES DISTRICT COURT
Add. 107

1   will let me reply afterwards, Your Honor.

2          THE COURT:  I will.  Thank you.

3          MR. BECK:  Yes.  Thank you, Your Honor.

4          THE COURT:  All right.  Mr. Gifford.

5          MR. GIFFORD:  Thank you, Your Honor.

6      Do you have any preliminary questions for me, or may I

7   respond to some of the points that were addressed by Mr. Beck?

8          THE COURT:  Yes, if you could respond particularly

9   with regard to the parking areas adjacent to any government

10  building first, that would be helpful.

11         MR. GIFFORD:  Yes, Your Honor.

12     The State's position with respect to parking lots

13  adjacent is that the term adjacent means parking lots that

14  exclusively serve a particular place.  So consistent with *Class*

15  and *Bonidy*, which analyzed this issue in a manner that it's

16  still good after *Bruen*, was not disrupted by the *Bruen*

17  framework, both cases are instructive here.

18     If a location is sensitive that a parking lot is adjacent

19  to that place, that parking lot exclusively serves the place in

20  the way that the parking lots did in *Class* and *Bruen*.  And

21  given the better interpretation of adjacent, the clearer

22  interpretation consistent with the rule of lenity,

23  constitutional avoidance, and legislative intent that the State

24  advances, plaintiffs' conduct is not even covered by the

25  adjacent parking lots clause within the relevant provisions

1  that they challenge, so the Court need not address the merits

2  of those arguments.

3       However, if the Court were to address the merits, then we

4  believe that the parking lots adjacent to government buildings

5  are sensitive for the same reasons that the courts held in

6  *Class* and *Bonidy*.

7       Does that address Your Honor's questions on parking lots?

8       THE COURT:  Yeah.  So if I'm to understand you, you

9  know, along the lines of *Class* then, I would look at what kind

10  of activities are conducted in the adjacent -- so adjacent

11  isn't just a geographical reference then; you're saying a

12  physical connection.  You're saying that there's adjacent

13  meaning where the business of the sensitive areas take place

14  also in the parking lot, that's what's meant adjacent to.

15       MR. GIFFORD:  Correct, Your Honor.  And that means

16  that the parking lots that the plaintiffs have highlighted,

17  such as the parking lot that is shared by the DMV and the Ross

18  and the Ace Hardware, would not be a sensitive place because it

19  does not exclusively serve the DMV.  Likewise, the parking lot

20  that's shared by plaintiff Kasprzycki's business and the

21  financial institution located in the same parking lot of his

22  business would not be a sensitive place because it is not

23  exclusively serving that bank.

24       THE COURT:  Okay.  Fair enough.  Thank you.  I

25  appreciate that.  That's a great clarification.


UNITED STATES DISTRICT COURT
**Add. 109**

1        All right.  So maybe this is the time -- good time to

2   segue to banks and financial institutions.  So I understand

3   what your arguments are.  You brought, you know, historical

4   examples.  And so are markets and fairs the same as banks and

5   financial institutions?

6        MR. GIFFORD:  We believe that they are analogous to

7   banks and financial institutions.  And I'd like to just flag at

8   the outset that plaintiffs have not shown that they have

9   standing to challenge the bank's provision because even in

10  their late-breaking declarations submitted with their reply,

11  which the State does not believe the Court should consider

12  because those declarations were not submitted with the moving

13  papers, the plaintiffs have not identified any banks that have

14  said that plaintiffs would be permitted to carry.

15       We also -- our position is that the bank provision cannot

16  be challenged even -- or the plaintiffs' challenge, rather, to

17  that provision fails at the first step of *Bruen* because the

18  plaintiffs have failed to show that the scope of the Second

19  Amendment covers their right to carry in financial institutions

20  in the first place.

21       But even if the Court were to analyze the question of the

22  second step, we believe that the tradition going back to the

23  1300s of restricting firearms in fairs and markets and other

24  commercial centers would provide a ready analog.

25       Judge Román's opinion in the *Frey* decision in the

UNITED STATES DISTRICT COURT

## Add. 110

1    Southern District of New York which analogized Times Square to
2    fairs and markets is instructive on this point.  And I'd like
3    to clarify that while plaintiffs try to disparage those early
4    fairs and markets laws as containing a terror requirement, it
5    nevertheless is significant that those laws holding the terror
6    requirement to the side isolated fairs and markets as unique
7    places.  And even Judge Suddaby in the *Antonyuk* decision on
8    which the plaintiffs rely recognized that fairs and markets
9    were unique places and indicated that if the plaintiffs in that
10   case had had standing to challenge the Times Square
11   prohibition, that he would have reached the same outcome that
12   Judge Román did in the *Frey* case.
13         And we also think just from the common sense perspective
14   and as the banks testified in support of this law, it would be
15   I believe shocking to the ordinary person to learn that the
16   state is unable to prohibit firearms in banks.
17         THE COURT:  Well, it may be that the individual
18   financial institutions can do so.  I mean, they're private
19   businesses, but they are -- they've invited the public to come
20   in.  So it may be that the state can't prohibit that, but it
21   may be on an individual basis that these banks and financial
22   institutions could do so; isn't that correct?
23         MR. GIFFORD:  The State agrees that financial
24   institutions can prohibit individuals from carrying firearms
25   onto their property, but the State as well possesses the power

1   to prohibit firearms in sensitive places, and given the long

2   tradition going back to the 1300s of prohibiting firearms in

3   commercial centers such as fairs and markets, and then there's

4   beyond that the entire robust tradition of 19th century

5   prohibitions on all manner of commercial and social places

6   where the proprietors privately could have prohibited firearms

7   themselves, the State believes that there is an ample -- ample

8   support for the banks and financial institutions provision.

9           THE COURT:  Okay.  You know -- and I understand your

10  common sense argument -- unfortunately, that wasn't included

11  anywhere in *Bruen* in terms of what the government or, you know,

12  your client's burden is in terms of, you know, demonstrating

13  overcoming the Second Amendment constitutional right.

14          MR. GIFFORD:  The point is well taken, Your Honor.

15  I believe that the common sense merely reinforces the long

16  tradition of regulation in these sorts of commercial spaces

17  going back to the 1300s.

18          THE COURT:  Okay.  I appreciate that.  And what

19  about the argument that the cutoff is 1791 so I shouldn't be

20  looking at anything?

21          MR. GIFFORD:  Thank you, Your Honor.  I'd like to

22  address that point in several respects.

23          I think the first is to dispel with the argument that

24  we've somehow relied on the now-vacated decision in *Bonidy* in a

25  way that affects our case at all.  That was one of myriad cases

UNITED STATES DISTRICT COURT

## Add. 112

1   that has found 1868 to be relevant, and that it's vacated makes
2   no difference to our argument.

3       The overwhelming majority of courts have found that 1868
4   is relevant.  Even the *Antonyuk* decision on which the
5   plaintiffs rely found that 1868 was relevant.  The *Maryland*
6   *Shall Issue* decision found that 1868 was relevant, the *Frey*
7   decision, and then numerous pre-*Bruen* decisions as well.

8       And with respect to the point that the content of the
9   Second Amendment and the Fourteenth Amendment right to bear
10  arms needs to be the same so that the right has the same
11  content with respect to the state and federal government, we
12  absolutely agree, but we believe that the content of that right
13  is determined as of 1868, and we think that the relevant
14  portion of Justice Thomas's opinion in *Bruen* speaks clearly to
15  that.  It cites and quotes at length from an article by Kurt
16  Lash which essentially explains that in 1868 the states that
17  ratified the Fourteenth Amendment breathed contemporary
18  meaning into that amendment and so breathes contemporary
19  meaning into the Second Amendment with respect to both the
20  states and the federal government.

21      And in a sense it's a theory of reversing corporation
22  against the federal government with respect to the Second
23  Amendment, but clearly it pegs the content of the Second
24  Amendment as applied against the states to an 1868
25  understanding.  And as we've explained and shown through the

1    laws from the middle of the century, but before and after 1868,

2    there is a wealth of relevant and analogous restrictions.

3         THE COURT:  Uh-huh.  Okay.  Fair enough.

4         So moving on to bars and restaurants serving alcohol, you

5    know, there's been this whole contention -- well, first of all,

6    I would say I tend to agree with regard to the general laws

7    about forbidding alcohol to militia and so forth, that's a

8    little far removed in terms of what we're talking about.

9         But you have presented, you know, laws in the

10   territories, Kansas, and then also a Connecticut law, so one of

11   the colonies barring or criminalizing possession of pistols by

12   intoxicated persons, talking about linking it up to the sale of

13   alcohol.  And then you have, of course, referred to different

14   areas about serving alcohol in fandangos and other places, so I

15   understand your argument about 1868.

16        And then I come back to the, you know -- you know, I

17   guess it's how many angels can dance, you know, on the top of a

18   pin -- the head of a pin, you know, how many historical analogs

19   does the State need to bring forth in order to make a

20   sufficient argument to overcome its burden?

21        MR. GIFFORD:  I'd like to make a few points in

22   response to that question because I think that the plaintiffs

23   have misread our history.  And while the State's position is

24   that the laws prohibiting individuals from drinking and

25   carrying guns are analogous, the State believes that they do

UNITED STATES DISTRICT COURT
**Add. 114**

1 inform our analysis here because the concerns of mixing alcohol
2 and firearms were the same then as they are now.

3       There are other laws that we cite, and this is on pages 8
4 and 9 of our brief, that are from the mid-1700s from states as
5 well that prohibit, for example, the sale of liquor anywhere
6 near a training ground, and so there those words specifically
7 prohibiting individuals from drinking and carrying firearms,
8 although the laws also did that.

9       And so really there's a tradition going back to the
10 mid-1700s, including the states as well and not just
11 territories, of prohibiting the sale of alcohol in proximity to
12 firearms regardless of whether those carrying the firearms were
13 drinking.

14       With respect to the number of laws, I believe that
15 Mr. Beck said that a majority of states need to have adopted
16 such laws.  The *Bruen* court did not impose anywhere near such a
17 high hurdle when explaining why the places that it understood
18 and assumed it settled to be sensitive were, in fact,
19 sensitive.  Some of those laws which the Court cited secondary
20 scholarship for were two laws in Maryland in the mid-1600s that
21 supported the designation of polling places as sensitive, maybe
22 one or two laws somewhere else.  There were very few laws, and
23 it was the fact that those laws were long established and had
24 not been challenged that was sufficient for the designation of
25 those places that we know are sensitive.  So that there's no

25

1    indication that a majority of states or colonies need to have

2    had such a law on the books.

3         And furthermore, the notion that territorial laws can be

4    disregarded altogether or that laws that cover a substantial

5    but nonmajoritarian population can be disregarded is

6    inconsistent with the *Bruen* decision. *Bruen* was saying simply

7    that where the weight of history cuts in one direction, a few

8    later laws from territories that cover less than one percent of

9    the population can't swing the analysis in the opposite

10   direction, and it was not saying that these laws deserve no

11   weight or that courts should be doing a percentage analysis.

12        THE COURT: Thank God, 'cause I don't want to do a

13   percentage analysis. It's enough that I have to look at

14   historical references and figure out whether or not -- or what

15   weight to give them.

16        All right. I appreciate that. Anything else with regard

17   to that?

18        MR. GIFFORD: On the bars and restaurants point, no,

19   Your Honor, although I would just like to again reiterate the

20   initial standing argument and the initial step one argument

21   because we think that the declarations that were submitted

22   should not be considered at this stage. But I would also like

23   to address the beaches point and the parkland point.

24        THE COURT: Yes.

25        MR. GIFFORD: With respect to the parkland

UNITED STATES DISTRICT COURT

**Add. 116**

1    point -- and again, we think that plaintiffs have delayed too

2    long simply to challenge this law on a TRO basis given that

3    they had two months from the time the bill was passed and

4    three weeks from the time that the law was signed.

5           But with respect to the state parks prohibition, Hawaii

6    Administrative Rule 13-146-19(a) says no firearms, I'm

7    paraphrasing, except as provided herein, and then (b) says you

8    can possess firearms in accordance with 13-146-41.  And that

9    says yes, you can't molest or kill animals unless you're

10   authorized.  So it's saying simply you cannot possess firearms;

11   that's the rule.  And then the exception is you can possess

12   them if you're authorized to hunt.  There's nothing in there

13   that the State has found that would suggest that there is some

14   embedded permission to carry for self-defense if you have a

15   concealed carry permit.

16          And so although not necessary to find that plaintiffs

17   have delayed too long to show irreparable harm, we -- the

18   State's position is that that is just another reason in order

19   to find that the State -- that the plaintiffs have delayed too

20   long.  So that was one point that I wanted to address that

21   Mr. Beck raised.

22          Another is the point that Mr. Beck made with respect to

23   beaches.  I believe that the -- to the extent that the

24   declaration specified the beaches that the plaintiffs want to

25   visit and specify how populated those beaches are, they're all

1 indicated to be moderately or very populated, so I don't even
2 think on this record that plaintiffs have demonstrated an
3 intent to visit an isolated beach.
4       But regardless, the analogs that we found and that we've
5 put forth to the Court and the expert evidence from software
6 now from Terence Young doesn't look to the density of parks and
7 beaches when determining the purpose for designating those as
8 sensitive.
9       The purpose of designating those locations as sensitive
10 is that they were meant to be places of quiet reflection and
11 enjoyment of nature, and that that enjoyment was disrupted by
12 the presence of firearms as it was by the presence of
13 projectiles, and even, according to Professor Young, of sports
14 and athletic activities which had to be taken and done in other
15 parts of the parks.
16       And the idea that there has been open natural space
17 forever is simply too reductive when one is trying to
18 understand the rise of the modern American parks movement and
19 the rise of modern American beaches.  The experience in Hawaii
20 with respect to beaches is a perfect illustration of this.
21       There has been beach land for a long time.  There has not
22 been modern beach tourism for a long time.  But even the modern
23 American parks movement, although it's taken for granted that
24 parks seem to exist everywhere, really didn't rise until the
25 mid-1800s, and our experts have explained that their kind of

1    earlier antecedents, such as the Boston Common, were not parks
2    in the modern conception of parks.  Even the article that
3    plaintiffs cite for that proposition that Boston Common was
4    somehow a relevant space is called *Before Parks* and it's
5    talking about spaces that predated modern American parks.
6         So when one looks to the beginning of modern American
7    parks, both urban parks, state parks, and national parks, one
8    is looking at parks like New York's Central Park, or Brooklyn's
9    Prospect Park, or Philadelphia's Fairmount Park, and all of
10   those parks.  And I believe the thought that parks in the five
11   most populous American cities with -- and this is in the
12   Cornell declaration -- all banned firearms in their parks.  So
13   to describe those as outliers I think is misleading and
14   certainly not consistent with the *Bruen* analysis.
15        One other point that I would like to make because on --
16   on the declaration, because I know that plaintiffs submitted a
17   number with their reply brief, is that plaintiffs have
18   submitted a declaration that purports to rebut Professor
19   Cornell's declaration, and at the preliminary injunction stage
20   we would like an opportunity to supplement all of our
21   declarations, but particularly the declaration submitted by
22   Professor Cornell, in order to respond to the purported
23   rebuttal declaration from -- from the expert, Mr. Cramer.
24            THE COURT:  Fair enough.  We'll be setting dates
25   with regard to that in terms of submission of affidavits and

1    declarations.

2           MR. GIFFORD:  Thank you, Your Honor.  And if Your

3    Honor wouldn't mind, I'd like to just address a few other

4    points --

5           THE COURT:  Yes, please.

6           MR. GIFFORD:  -- that were not addressed by

7    Mr. Beck.

8           THE COURT:  Yes.

9           MR. GIFFORD:  One of the first points that I think

10    is crucial to understanding this case is the plaintiffs' lack

11    of standing.  As discussed, plaintiffs have submitted some

12    11th-hour declarations that should not be considered with

13    respect to sensitive places.

14        But with respect to the default rule, plaintiffs have

15    failed to show standing for a more fundamental reason which is

16    that they cannot show traceability or redressability because

17    any injury they have is traceable to the decision of the

18    private property owner not to allow plaintiffs on to their

19    property.

20        As the State understands the late-breaking declarations

21    that the plaintiffs have submitted, these are private property

22    owners who are saying We welcome plaintiffs as gun owners to

23    carry guns on our property, but we won't allow them on as long

24    as 134-E is on the books.

25        The State understands that to be an express grant of

1    permission, in which case the plaintiffs have not suffered any

2    injury from their failure or their inability to go on to this

3    private property.  To the extent it's an exclusion, it's -- the

4    State believes something approaching gamesmanship because there

5    seems to be a preference to allow the plaintiffs on and only a

6    possible denial in the hopes of creating a case.

7          Plaintiffs argue that it's novel to require them to show,

8    to allege that they would be permitted to carry in any of the

9    places that they would like to carry absent the restrictions

10   that they challenge, but there's nothing novel about requiring

11   plaintiffs to allege and prove standing.  That's a bedrock

12   Article III principle.  And none of the other decisions

13   post-*Bruen* of which we're aware have addressed the first step

14   standing arguments that we're making here, particularly with

15   respect to the default rule.

16         The plaintiffs rely on a few decisions repeatedly, such

17   as the *Antonyuk* decision and the *Koons* decision.  Those didn't

18   address the precise arguments we're raising here, and even to

19   the extent that they come close, those decisions have both been

20   stayed by the appellate courts pending appeal.

21         I'd like to clarify one point about how we understand the

22   first step of the *Bruen* test to work.  The plaintiffs seem to

23   say that all that matters is the dictionary definition of the

24   words "bear" and "arms," and as long as you are carrying some

25   sort of weapon, then you've satisfied *Bruen*'s first step.  If

1    that were the case, then it would be trivially easy to satisfy

2    *Bruen*'s first step.  Plaintiff would be bearing arms regardless

3    of whether he wanted to bring a rifle to a shooting range or a

4    hand grenade into a school.  And there needs to be more content

5    than that when one is trying to understand *Bruen*'s first step.

6           Even the *Koons* decision and the *Antonyuk* decision on

7    which the plaintiffs rely, which again have been stayed in full

8    or in large part to the extent they ruled against the State,

9    understood that there must be some sort of locational

10   restriction in the text of the Second Amendment such that the

11   Second Amendment even at step one would not allow individuals

12   to carry on to private property close to the public without the

13   owner's consent.

14          And I think that the Eleventh Circuit's decision in the

15   *GeorgiaCarry.org* decision -- *GeorgiaCarry.org* case addressed

16   this exact point, and although it's pre-*Bruen*, it was doing a

17   step one analysis which *Bruen* endorsed, is probably consistent

18   with *Heller*, and the court there explained that there is no

19   right -- it is not within the scope of the Second Amendment to

20   carry firearms on private property without the owner's consent.

21          I believe that those are -- we've talked through most of

22   the step two arguments with respect to bars, parks, and

23   beaches, and financial institutions, and so I think that I

24   don't have anything further to say on the second step of *Bruen*

25   as it applies to the places that plaintiffs are challenging.

1    I would like to say with respect to the second step as it

2    applies to the private property default rule, if the Court

3    decides to analyze the private property default rule at step

4    two -- and we believe that we would win at steps one and two --

5    there is a long tradition going back to the early 1700s of

6    prohibiting individuals from carrying guns on other's property

7    without consent.  And the plaintiffs argue that these laws

8    dealt only with hunting, but it's apparent from the text of the

9    laws which we have submitted that these laws imposed distinct

10   prohibitions on hunting and carrying without consent.

11       I'd also like to address Plaintiff Kasprzycki's compelled

12   speech claims because we believe Plaintiff Kasprzycki is not

13   being compelled to say anything, and unlike in other compelled

14   speech cases, Plaintiff Kasprzycki is not required to speak a

15   specific message as a condition of opening his business to the

16   public.  Instead, he may operate his business and simply remain

17   silent on the issue of guns.

18       Even the *Koons* case, on which plaintiffs rely heavily,

19   rejected this compelled speech argument, and there's no

20   distinction within *Koons* that could be made as to speech with

21   respect to property that goes open to the public and closed to

22   the public, which is a distinction that plaintiffs try to draw.

23       The *Antonyuk* decision did accept the compelled speech

24   arguments that plaintiffs are making, but then it was stayed by

25   the Second Circuit meaning that the Second Circuit has found

1    that that claim is likely to fail.

2         Furthermore, if Plaintiff Kasprzycki were correct that

3    the default rule compelled speech by requiring him to express

4    consent to allow guns on his property, then the opposite rule

5    would compel even more speech because it would require Hawaii

6    businesses, the majority of which oppose guns on their

7    property, to express their lack of consent in order to prohibit

8    guns.  And this is detailed in a very helpful way in the amicus

9    brief that Honolulu submitted in support of our opposition.

10        And there's just one final point I would like to make

11   with respect to scope of relief, which is that plaintiffs

12   cannot obtain facial relief here because they cannot show that

13   there is no set of circumstances in which the challenged

14   provisions can be constitutionally applied.  They argue that

15   they can bring an overbreadth challenge, but overbreadth

16   challenges are limited to the First Amendment context, and they

17   are disfavored even there.

18        The plaintiffs cite Judge Seabright's decision in

19   *Yukutake* and the Supreme Court's decisions in *Heller* and *Bruen*,

20   but none of those cases applied an overbreadth framework, so

21   plaintiffs can only bring an as-applied challenge here, and for

22   the reasons that I've discussed, their challenge fails.

23        I'd welcome any further questions from the Court.

24        THE COURT:  I don't have any.  Thank you.

25        I'll turn to Mr. Beck and give him the final word.

1          MR. GIFFORD:  Thank you, Your Honor.

2          MR. BECK:  I -- I won't address everything that

3    Mr. Gifford said because most of it has been addressed in our

4    briefing, but I do have a few points to make.

5          As to the declarations, as an initial matter we don't

6    actually think the Court needs to use the declarations because

7    we have standing apart from that.

8          However, Judge Otake in *Yukutake v. Lopez*, which was --

9    is a standing decision that she decided in -- it was about

10   January or February -- it was this year -- had a -- accepted

11   submissions made after a -- in a reply in a situation just like

12   that where we filed these as supplemental authority because the

13   State made a new argument in I think it was a reply brief.  So

14   there's -- Judge Otake's reasoning was fully applicable here in

15   this situation because it was just raised in their response for

16   the first time.  We addressed that in the reply with the

17   declarations.

18         As for the issue of restaurants, we are not challenging

19   the State's ability to ban people who are actually drinking

20   from carrying a firearm, and all the State's historical sources

21   are dealing with people who are actually drinking.

22         Our clients want to order a pizza and -- while not

23   drinking -- and, you know, just simply eat there.  And it

24   doesn't -- it's not really relevant whether someone is having a

25   beer, you know, a few tables down.  So on -- and there's

1   already a Hawaii law that bans operating firearms while

2   intoxicated, so that wouldn't go away.

3            THE COURT:  Well, so that's a little finer point.

4   So the -- so under the *Bruen* analysis that the court's supposed

5   to conduct, the State has brought forth examples of laws that

6   tie the sale of alcohol to individuals, you know, for

7   consumption and banning firearms.  And it doesn't seem -- and I

8   may have missed it, so point it out to me -- that any of these

9   laws indicate, well, it's -- but if people are just eating and

10  they're not consuming -- it didn't seem to be the consumption

11  of alcohol, but the sale of alcohol, you know, impliedly for

12  consumption.

13       So I think you're drawing a very fine distinction saying,

14  well, as long as you go to the restaurant and you have the

15  intent of not consuming alcohol but just eating, consuming food

16  or nonalcoholic beverages, then the state shouldn't be able to

17  forbid you from carrying a firearm.

18           MR. BECK:  Well, I -- Your Honor, well, at least I'm

19  saying we're not challenging that right here.  And, you know,

20  that's a much different situation.  If -- if this is 1791, I go

21  and I -- and I'm ordering a drink, I mean, there's a safe

22  assumption that I want to drink that drink --

23           THE COURT:  Right.

24           MR. BECK:  -- you know.  And --

25           THE COURT:  But it's not so much ordering a drink;

UNITED STATES DISTRICT COURT

**Add. 126**

1  it's going to an establishment that serves alcohol, whether or

2  not you order it.  And that's the situation that we find

3  ourselves in under the current law that you're seeking the TRO,

4  right?  It's -- it's a bar or restaurant serving alcohol for

5  consumption on premises, not, you know, a supermarket where

6  you're going to take it out or a liquor store.  It's for

7  consuming it on the premises, and they've given me these

8  historical analogs where there's been a distinction between

9  banning firearms where there's the consumption of alcohol.

10         MR. BECK:  You know, I -- my recollection of reading

11  those statutes was these all pertain to situations where people

12  are actively ordering or drinking alcohol.  I don't recall

13  seeing any statutes that just simply forbid carrying a firearm,

14  you know, being within close proximity to the service of

15  alcohol.  I generally don't --

16         THE COURT:  I don't think there's any fandango,

17  ballroom, or what have you where alcohol is or intoxicating

18  liquors are consumed or sold -- I can't remember the exact

19  words -- and so I'm with you on that.

20         But that seemed to be the connection this place -- I

21  mean, they've cited all these other prior cases about

22  specifically banning firearms or not allowing firearms where --

23  to an intoxicated, you know, militia or so forth.

24         But there was also the Oklahoma law banning firearms at

25  any place where intoxicating liquors are sold, 1890 Oklahoma

1    Territory Statute.  So laws such as that, sort of this

2    connection of the place where these are sold, you know, with

3    the inference they're consumed there, you know, and that's

4    specifically this -- this law is specifically tailored for

5    consumption on premises and adjacent parking lots, so serving

6    alcohol for consumption on premises and adjoining parking lots.

7         I realize the distinction that you're making.  They're

8    going to go to a place where the restaurants and bars may sell

9    alcohol for consumption on the premises and they're not going

10   to consume it and they want to be able to carry firearms

11   because they're not consuming alcohol; they're going to be

12   eating or drinking nonalcoholic beverages.

13        MR. BECK:  Yes, Your Honor.  I -- without -- just as

14   a -- don't have a -- without conceding that --

15        THE COURT:  Okay.

16        MR. BECK:  -- those statutes are specifically, you

17   know, prohibiting carrying guns within restaurants, I mean.

18        THE COURT:  Okay.

19        MR. BECK:  One, I mean, that's a territorial law

20   which is specifically forbidden from *Bruen*, and it's 1890 which

21   is a little bit late even if we're talking about -- even if

22   1868 were used, and again, you know, our position is 1791 is

23   the year.

24        THE COURT:  Right.

25        MR. BECK:  If it's just one that the State was able

UNITED STATES DISTRICT COURT
**Add. 128**

38

1  to find, that just simply wouldn't be enough and, you know.

2          THE COURT:  Understood.  That's the only one I have

3  in my notes that I can talk to.  I remember there was a

4  Louisiana -- I mean a New Orleans law that you pointed to, but

5  I guess you would say that's also a territory as opposed to one

6  of the colony states.  Understood.  I think I understand your

7  argument.

8          I didn't mean to interrupt you.  Is there anything else

9  you want to add or clarify?

10         MR. BECK:  Just we addressed -- no, just the last

11  thing is the Eleventh Circuit *GeorgiaCarry* case.  The Eleventh

12  Circuit very specifically said that they would frame that

13  argument in a situation where there was

14  affirmative -- affirmative denial to carry, and does a person

15  have a right to come onto a land where they've affirmatively

16  not been told they can't carry.  I say this a little more

17  articulately within the briefing.  It's within the footnotes,

18  though, so I just wanted to raise that so it's not overlooked.

19         But beyond that, that's the remainder of my argument,

20  Your Honor.

21         THE COURT:  Thank you very much.

22  Well, I thank --

23         MR. BECK:  Thank you very much.

24         THE COURT:  -- all counsel for their briefing and

25  their oral arguments, very helpful to the court.  The court

UNITED STATES DISTRICT COURT

**Add. 129**

1    will take the matter under advisement and issue its written

2    order as soon as possible.  And I'm not going to give a

3    specific date for that, but we recognize, you know, that you

4    folks are looking forward to the decision and it is a motion

5    for temporary restraining order, so we will move with all

6    cautious speed as much as possible.

7         All right.  Wish all of you a very good Friday.

8         There being nothing further before the court, we stand

9    adjourned.  Good day, everyone.

10         THE COURTROOM MANAGER:  This Honorable Court is now

11   in recess.

12         (Proceedings concluded at 11:28 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
**Add. 130**

```
1                    COURT REPORTER'S CERTIFICATE

2

3                    I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10                   DATED at Honolulu, Hawaii, August 14, 2023.

11

12

13                         /s/ Debra Read

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 15, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal